# Exhibit 1

1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  DARREN J. ROBBINS (168593)
   JAMES I. JACONETTE (179565)
3  JENNIFER N. CARINGAL (286197)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)
      – and –
6  DENNIS J. HERMAN (220163)
   DAVID W. HALL (274921)
7  Post Montgomery Center
   One Montgomery Street, Suite 1800
8  San Francisco, CA  94104
   Telephone: 415/288-4545
9  415/288-4534 (fax)

10  Attorneys for Plaintiffs

**FILED**
**SAN MATEO COUNTY**

MAR 29 2016

Clerk of the Superior Court
By _____
      DEPUTY CLERK

File By Fax

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                        COUNTY OF SAN MATEO

13  GLENVIEW CAPITAL PARTNERS, L.P.,          )   **VIA FAX**
    GLENVIEW INSTITUTIONAL PARTNERS,          )
14    L.P.,                                   )   Case No.  **CIV537971**
    GLENVIEW CAPITAL MASTER FUND,             )
15    LTD.,                                   )   COMPLAINT FOR VIOLATIONS OF THE
    GLENVIEW CAPITAL OPPORTUNITY              )   SECURITIES ACT OF 1933 AND STATE
16    FUND, L.P. and                          )   LAW
    GLENVIEW OFFSHORE OPPORTUNITY             )
17    MASTER FUND, LTD.,                      )
                                              )
18                          Plaintiffs,       )
            vs.                               )
19                                            )
    SUNEDISON, INC.,                          )
20  TERRAFORM GLOBAL, INC.,                   )
    AHMAD CHATILA,                            )
21  BRIAN WUEBBELS,                           )
                                              )   **DEMAND FOR JURY TRIAL**
22  _____ )

    [Caption continued on following page.]
23

24

25

26

27      Copyright © 2016 by Robbins Geller Rudman & Dowd LLP.  Robbins Geller Rudman & Dowd LLP will
    vigorously defend all of their rights to this writing/publication.  All rights reserved – including the right to reproduce in
    whole or in part in any form.  Any reproduction in any form by anyone of the material contained herein without the
28  permission of Robbins Geller Rudman & Dowd LLP is prohibited.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

| | |
|---|---|
| 1 | CARLOS DOMENECH ZORNOZA, ) |
| | MARTIN TRUONG, ) |
| 2 | JEREMY AVENIER, ) |
| | ALEJANDRO HERNANDEZ, ) |
| 3 | EMMANUEL HERNANDEZ, ) |
| | ANTONIO R. ALVAREZ, ) |
| 4 | PETER BLACKMORE, ) |
| 5 | CLAYTON DALEY JR., ) |
| | GEORGANNE PROCTOR, ) |
| 6 | STEVEN TESORIERE, ) |
| 7 | JAMES B. WILLIAMS, ) |
| | RANDY H. ZWIRN, ) |
| 8 | GOLDMAN, SACHS & CO., ) |
| | J.P. MORGAN SECURITIES LLC, ) |
| 9 | BARCLAYS CAPITAL INC., ) |
| | CITIGROUP GLOBAL MARKETS INC., ) |
| 10 | MORGAN STANLEY & CO. LLC, ) |
| 11 | MERRILL LYNCH, PIERCE, FENNER & ) |
| | SMITH INCORPORATED, ) |
| 12 | DEUTSCHE BANK SECURITIES INC., ) |
| | BTG PACTUAL US CAPITAL LLC, ) |
| 13 | SMBC NIKKO SECURITIES AMERICA, ) |
| 14 | INC., ) |
| | CREDIT AGRICOLE CIB, ) |
| 15 | CREDIT SUISSE, ) |
| | SANTANDER, ) |
| 16 | SOCIETE GENERALE, ) |
| | MACQUARIE CAPITAL (USA), INC., ) |
| 17 | MCS CAPITAL MARKETS LLC and ) |
| 18 | DOES 1-25, inclusive, ) |
| | ) |
| 19 | Defendants. ) |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................... 1

SUMMARY OF THE ACTION ............................................................................... 1

JURISDICTION AND VENUE ............................................................................... 2

PARTIES .................................................................................................................. 2

    A.    Plaintiffs ....................................................................................................... 2

    B.    Company Defendants .................................................................................... 3

    C.    Individual Defendants .................................................................................. 4

    D.    Director Defendants ...................................................................................... 4

    E.    Underwriter Defendants ............................................................................... 5

    F.    Doe Defendants ............................................................................................ 9

BACKGROUND TO THE OFFERINGS ................................................................ 9

    A.    SUNE Takes on Billions of Dollars in Debt as It Transforms Itself into a Renewable Energy Project Developer ........................................................... 9

    B.    SUNE Leverages Its TERP Interests to Obtain a $410 Million Margin Loan ........... 13

    C.    SUNE Prepares to Launch GLBL by Selling $510 Million in Preferred Class D Securities and Taking on More than $1 Billion in Debt ........................................ 14

    D.    SUNE Incurs Billions of Dollars in Debt and Obligations to Acquire Projects to Drop Down to GLBL and TERP and Misrepresents that It Has Ample Liquidity to Do So ..................................................................................... 16

    E.    As Its Liquidity Deteriorates, SUNE Proceeds with the GLBL IPO and GLBL Bond Offering ................................................................................... 20

    F.    Unbeknownst to Investors SUNE Borrows $169 Million from Goldman at an Astounding 15% Interest Rate to Finance the Acquisition of GLBL's Start-up Projects ........................................................................................................ 22

    G.    Five Days After the GLBL IPO Is Completed, SUNE Reports a Widening Second Quarter Loss that Increases the Risk of a Margin Loan Default, but Represents to Investors that Its Liquidity Remains Strong ........................... 23

    H.    SUNE Does Not Disclose a Breach of the Debt Covenants on the Margin Loan ............................................................................................................. 26

    I.    SUNE Sells $650 Million in Preferred Stock Without Disclosing the 15% Goldman Loan, the Breach of the Margin Loan and Worsening Liquidity Risks to Investors ....................................................................................... 27

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

**Page**

J.    SUNE's Liquidity Problem ..................................................................... 29

K.    SUNE Cancels Projects, Reveals the Margin Loan Breach and the 15% Goldman Loan, and Admits that It Had Insufficient Liquidity to Meet the Growth It Forecast ................................................................................ 31

FIRST CAUSE OF ACTION ....................................................................................... 37

For Violation of §11 of the 1933 Act in Connection with the SUNE Preferred Offering Against SUNE, Chatila, Wuebbels, Truong, the SUNE Directors and the SUNE Underwriters ............................................................. 37

SECOND CAUSE OF ACTION .................................................................................. 45

For Violation of §12(a)(2) of the 1933 Act in Connection with the SUNE Preferred Offering Against SUNE, Chatila, Wuebbels, Alex Hernandez, the SUNE Directors and the SUNE Underwriters ............................................ 45

THIRD CAUSE OF ACTION ....................................................................................... 46

For Violation of §15 of the 1933 Act in Connection with the SUNE Preferred Offering Against Chatila, Wuebbels and Truong ....................................... 46

FOURTH CAUSE OF ACTION ................................................................................... 47

For Violation of §12(a)(2) of the 1933 Act in Connection with the GLBL Bond Offering Against SUNE, GLBL, the Individual Defendants and the GLBL Bond Underwriters ................................................................................... 47

FIFTH CAUSE OF ACTION ....................................................................................... 57

For Violation of §15 of the 1933 Act in Connection with the GLBL Bond Offering Against SUNE, Chatila, Wuebbels and Truong .......................... 57

SIXTH CAUSE OF ACTION ...................................................................................... 57

For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection with the Purchase of GLBL Bonds Against GLBL, SUNE, Chatila, Wuebbels and the GLBL Bond Underwriters ............................................................ 57

SEVENTH CAUSE OF ACTION ................................................................................. 59

For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection with the Conversion of GLBL Class D Securities to GLBL Common Stock Against GLBL, SUNE, Chatila and Wuebbels ........................................ 59

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1

2                                                                                    **Page**

3

EIGHTH CAUSE OF ACTION .......................................................................................... 61

For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection
    with the Purchase of GLBL Class D Securities Against GLBL, SUNE,
    Chatila, Wuebbels and the GLBL Placement Agents ................................................. 61

NINTH CAUSE OF ACTION ............................................................................................ 65

For Breach of Contract in Connection with the Purchase of GLBL Class D
    Securities Against GLBL .......................................................................................... 65

TENTH CAUSE OF ACTION .......................................................................................... 67

For Negligent Misrepresentation in Connection with the Purchase of GLBL Class D
    Securities Against SUNE, GLBL, Chatila, Wuebbels and the GLBL
    Placement Agents ...................................................................................................... 67

PRAYER FOR RELIEF ...................................................................................................... 68

JURY DEMAND ................................................................................................................... 68

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

**INTRODUCTION**

1.      SunEdison, Inc. ("SUNE") and its controlled subsidiary, TerraForm Global, Inc. ("GLBL"), their officers and directors and the investment banks working with them together sold more than $2.5 billion of newly issued securities to Plaintiffs (as defined below) and other investors between June 2015 and August 2015. Those securities were sold using offering documents that contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made therein not misleading. As the truth about SUNE and GLBL and the implications thereof began to emerge, the price of the securities purchased by Plaintiffs declined significantly, inflicting substantial harm on Plaintiffs.

**SUMMARY OF THE ACTION**

2.      SUNE is a worldwide developer of solar, wind and other renewable energy projects and facilities. GLBL and its sister subsidiary, TerraForm Power, Inc. ("TERP"), were formed by SUNE and its Board of Directors to own and operate the renewable energy projects SUNE developed or acquired, returning the majority of the cash flow from those projects to investors as dividends. TERP and GLBL – known as "yieldcos" for the dividends they were designed to generate – were marketed to investors as "high growth" companies that would generate annual dividend growth of 20% or more based on SUNE's purported ability to continuously develop renewable energy projects that could be "dropped down" to TERP and GLBL at favorable rates of return. As the majority owner of both yieldcos, SUNE asserted it would reap the financial rewards of the projects it developed.

3.      SUNE told investors that it had sufficient existing sources of capital to acquire and develop renewable energy projects at levels that would support the dividend and growth estimates disseminated by defendants with respect to both GLBL and TERP. The truth was – it did not. Moreover, defendants made such statements while failing to disclose SUNE's weakened liquidity position and its deteriorating borrowing capacity. Defendants also neglected to disclose that SUNE had breached the debt covenants of one of its borrowing agreements and had been required to post hundreds of millions of dollars in additional collateral as a result. Defendants likewise failed to disclose that SUNE had borrowed $169 million at an astonishingly high effective interest rate of 15% in desperation to raise the funds SUNE needed to acquire projects for GLBL and/or to cure the debt covenant breach.

- 1 -

4.     After Plaintiffs completed their purchases of SUNE and GLBL securities, defendants disclosed the debt covenant breach, margin calls and high interest rate borrowing.  Defendants also admitted that SUNE lacked the liquidity necessary to fund the development of the very projects that GLBL's dividend and growth forecasts were dependent upon.   SUNE promptly cancelled the acquisition, development and sale of numerous projects that were to be owned or operated by GLBL due to the lack of liquidity necessary to complete them.  Plaintiffs have suffered substantial harm as a result of their purchases of SUNE and GLBL securities.

## JURISDICTION AND VENUE

5.     This Court has original subject matter jurisdiction under the California Constitution, Article VI, §10, and pursuant to §22 of the Securities Act of 1933 ("1933 Act") with respect to claims asserted under §§11, 12(a)(2) and 15 of the 1933 Act, 15 U.S.C. §§77(k), 77l(a)(2) and 77(o). Removal is barred by §22 of the 1933 Act.

6.     This Court has personal jurisdiction under California Code of Civil Procedure §410.10 because defendants and their agents prepared the offering documents and affirmatively solicited the sale of the subject securities in and from California and those contacts with California have a substantial connection to the claims alleged herein.   The violations complained of herein arise from acts that occurred in, emanated from, or were authorized within this County, including through the involvement of defendants or their representatives or alter egos who reside in, conduct business in, are headquartered in, or have their principal places of business in this County.  In addition, some of the securities that are the subject of this action were sold in this County.

7.     Venue in this Court is proper under California Code of Civil Procedure §§395 and 395.5 because, *inter alia*, several defendants reside in this County.

## PARTIES

**A.     Plaintiffs**

8.     Plaintiffs Glenview Capital Partners, L.P., Glenview Institutional Partners, L.P., Glenview Capital Master Fund, Ltd., Glenview Capital Opportunity Fund, L.P. and Glenview Offshore Opportunity Master Fund, Ltd. are investment funds managed by Glenview Capital Management LLC ("Glenview" or "Plaintiffs").  Glenview purchased, acquired and/or sold SUNE and GLBL securities as

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

described herein, including SUNE preferred stock, GLBL Class D units, GLBL common stock and GLBL bonds, and sustained damages as a result thereof.

**B.    Company Defendants**

9.     Defendant SunEdison, Inc. ("SUNE") is a company in the business of designing, constructing and operating solar, wind, hydroelectric and other renewable energy power plants. In October 2011, SUNE moved its global power headquarters from Maryland to Belmont, California, within this County, from where it oversees the research, construction and development of worldwide renewable energy projects.

10.     Defendant TerraForm Global, Inc. ("GLBL") is an owner and operator of renewable energy projects developed or acquired by SUNE, its controlling shareholder and sponsor. GLBL became a public company upon the completion of its SUNE-sponsored initial public offering ("IPO") on July 31, 2015. GLBL is the direct successor in interest to TerraForm Global LLC.[1] SUNE controls 98% of the voting rights in GLBL through its ownership of all of the outstanding shares of GLBL Class B common stock. Each share of Class B common stock entitles SUNE to 100 votes on all matters presented to shareholders, as compared with 1 vote for each share of Class A common stock. SUNE directly appoints the members of GLBL's board of directors, the majority of whom are current or former SUNE executives or employees. SUNE also controls the day-to-day operations of GLBL through a Management Services Agreement, as described below. GLBL is a "controlled company" within the meaning of the corporate governance standards of the NASDAQ Global Select Market. By virtue of SUNE's ownership and contractual interests and voting rights in GLBL, and the manner in which it exercises those rights, SUNE dominates and controls GLBL, causing GLBL to function as an instrumentality and alter ego of SUNE.

11.     SUNE and GLBL (the "Company Defendants") solicited the investing public to purchase securities issued pursuant to the offering documents, hired and assisted the underwriters, prepared, reviewed and contributed to the offerings and offering documents, and participated in road shows and

---

[1]   "GLBL" refers in context to its immediate predecessors, TerraForm Global LLC (with respect to actions or events taking place from May 7, 2009 to the commencement of the July 31, 2015 public offering) and SunEdison Emerging Markets Co. (with respect to actions and events taking place prior to May 7, 2009).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    other promotions to meet with and present favorable information to potential investors, including

2    Plaintiffs named herein, all motivated by their own financial interests.

3    **C.      Individual Defendants**

4           12.     Defendant Ahmad Chatila ("Chatila") was, at all relevant times, the President, Chief

5    Executive Officer ("CEO") and a director of SUNE, the Chairman of the Board of GLBL and a director

6    of TERP.  Chatila is a citizen of California.

7           13.     Defendant Brian Wuebbels ("Wuebbels") was, at all a relevant times, the Executive Vice

8    President, Chief Administrative Officer, and Chief Financial Officer ("CFO") of SUNE, and a director

9    of both GLBL and TERP.

10          14.     Defendant Carlos Domenech Zornoza ("Domenech") was, at all relevant times, the CEO

11   and a director of both GLBL and TERP.  Domenech had previously served as an executive officer of

12   SUNE.

13          15.     Defendant Martin Truong ("Truong") was, at all relevant times, the Senior Vice

14   President, General Counsel and Secretary of SUNE and a director of both GLBL and TERP.

15          16.     Defendant Jeremy Avenier ("Avenier") was the CFO of GLBL until October 9, 2015,

16   when he left GLBL to return to SUNE.  Avenier is a citizen of California and resides in Redwood City,

17   within this County.

18          17.     Defendants Chatila, Wuebbels, Domenech, Truong and Avenier are collectively referred

19   to herein as the "Individual Defendants."

20          18.     Defendant Alejandro "Alex" Hernandez ("Alex Hernandez") was CFO of TERP from

21   September 2014 until October 9, 2015, when he left TERP to become Executive Vice President and

22   CFO of GLBL.

23   **D.      Director Defendants**

24          19.     Defendant Emmanuel Hernandez ("Hernandez") was, at all relevant times, the Chairman

25   of the Board of SUNE.  Hernandez is a citizen of California.

26          20.     Defendant Antonio R. Alvarez ("Alvarez") was, at all relevant times, a director of

27   SUNE.  Alvarez is a citizen of California.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

21. Defendant Peter Blackmore ("Blackmore") was, at all relevant times, a director of SUNE. Blackmore is citizen of California and resides in Atherton, within this County.

22. Defendant Clayton Daley Jr. ("Daley") was, at all relevant times, a director of SUNE.

23. Defendant Georganne Proctor ("Proctor") was, at all relevant times, a director of SUNE. Proctor is a citizen of California.

24. Defendant Steven Tesoriere ("Tesoriere") was, at all relevant times, a director of SUNE.

25. Defendant James B. Williams ("Williams") was, at all relevant times, a director of SUNE. Williams is a citizen of California.

26. Defendant Randy H. Zwirn ("Zwirn") was, at all relevant times, a director of SUNE.

27. Defendants Hernandez, Chatila, Alvarez, Blackmore, Daley, Proctor, Tesoriere, Williams and Zwirn are collectively referred to herein as the "SUNE Directors."

28. The defendants named in ¶¶12-16 and 19-26 signed the offering documents, solicited the investing public to purchase securities issued pursuant the offering documents, hired and assisted the underwriters, prepared, reviewed and contributed to the offerings and offering documents, and participated in road shows and other promotions to meet with and present favorable information to potential investors, including Plaintiffs, all motivated by their own and the Company Defendants' financial interests.

**E. Underwriter Defendants**

29. Defendant Goldman, Sachs & Co. ("Goldman") is an investment banking and financial services corporation that maintains offices and operations in California. Goldman served as an underwriter of the GLBL IPO and a co-lead underwriter of the GLBL Bond Offering (as defined below) as well as a co-lead underwriter of the SUNE Preferred Offering (defined below). Goldman also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

30. Defendant J.P. Morgan Securities LLC ("JP Morgan") is an investment banking and financial services corporation that maintains offices and operations in California. JP Morgan served as a lead underwriter of the GLBL IPO and the GLBL Bond Offering as well as a co-lead underwriter of the SUNE Preferred Offering. JP Morgan also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

31.     Defendant Barclays Capital Inc. ("Barclays") is an investment banking and financial services corporation that maintains offices and operations in this County. Barclays served as a lead underwriter of the GLBL IPO and the GLBL Bond Offering. Barclays also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

32.     Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking and financial services corporation that maintains offices and operations in California. Citigroup served as an underwriter of the GLBL IPO and a co-lead underwriter of the GLBL Bond Offering. Citigroup also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

33.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking and financial services corporation that maintains offices and operations in this County. Morgan Stanley served as an underwriter of the GLBL IPO and a co-lead underwriter of the GLBL Bond Offering as well as a co-lead underwriter of the SUNE Preferred Offering. Morgan Stanley also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

34.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an investment banking and financial services corporation that maintains offices and operations in this County. Merrill Lynch served as an underwriter of the GLBL IPO and a co-lead underwriter of the GLBL Bond Offering as well as a co-lead underwriter of the SUNE Preferred Offering. Merrill Lynch also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

35.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is an investment banking and financial services corporation that maintains offices and operations in this County. Deutsche Bank served as an underwriter of the GLBL IPO and a co-lead underwriter of the GLBL Bond Offering as well as co-lead underwriter of the SUNE Preferred Offering. Deutsche Bank also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

36.     Defendant BTG Pactual US Capital LLC ("BTG") is an investment banking and financial services corporation that served as an underwriter of the GLBL IPO. BTG also served as a placement agent for GLBL's pre-IPO offering of Class D securities.

37.     Defendant SMBC Nikko Securities America, Inc. ("SMBC") is an investment banking and financial services corporation that served as an underwriter of the GLBL IPO and as an underwriter of the GLBL Bond Offering.

38.     Credit Agricole CIB ("Credit Agricole") is an investment banking and financial services corporation that served as an underwriter of the GLBL Bond Offering.

39.     Credit Suisse is an investment banking and financial services corporation that served as an underwriter of the GLBL Bond Offering.

40.     Santander is an investment banking and financial services corporation that served as an underwriter of the GLBL Bond Offering.

41.     Societe Generale is an investment banking and financial services corporation that served as an underwriter of the GLBL Bond Offering.

42.     Defendant Macquarie Capital (USA), Inc. ("Macquarie") is an investment banking and financial services corporation that maintains offices and operations in California.  Macquarie served as a co-lead underwriter of the SUNE Preferred Offering.

43.     Defendant MCS Capital Markets LLC ("MCS") is an investment banking and financial services corporation that served as an underwriter of the SUNE Preferred Offering.

44.     Defendants Goldman, JP Morgan, Barclays, Citigroup, Morgan Stanley, BTG, Deutsche Bank and Merrill Lynch served as Placement Agents for the pre-IPO sale of GLBL Class D securities, and are collectively referred to herein as the "GLBL Placement Agents."

45.     Defendants Goldman, JP Morgan, Barclays, Citigroup, Morgan Stanley, Merrill Lynch, Deutsche Bank, SMBC, Credit Agricole, Credit Suisse, Santander, and Societe Generale served as underwriters of the GLBL Bond Offering and are collectively referred to herein as the "GLBL Bond Underwriters."

46.     Defendants Goldman, JP Morgan, Morgan Stanley, Merrill Lynch, Deutsche Bank, Macquarie and MCS served as the underwriters of the SUNE Preferred Offering and are collectively referred to herein as the "SUNE Underwriters."

- 7 -

47.     The GLBL Bond Underwriters and SUNE Underwriters are referred to herein as the "Underwriter Defendants." The Underwriter Defendants participated in the violations complained of herein as detailed below:

(a)     The underwriters are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the offerings and shared tens of millions of dollars in fees collectively for doing so.  The underwriters arranged multi-city roadshows prior to the offerings between July 21, 2015 and July 29, 2015 with respect to the GLBL offerings, including June 28, 2015 and July 29, 2015 meetings in Los Angeles and July 29, 2015 meetings in San Francisco, which were orchestrated by the Underwriter Defendants together with SUNE Senior Vice President Manu Sial, Vice President of Investment Relations Robert Morris, Alex Hernandez and GLBL CFO Avenier, during which they, the other defendants and other representatives of the Company Defendants, met with potential investors and presented favorable information about the Company Defendants as well as their operations and financial prospects.

(b)     With respect to the SUNE Preferred Offering, defendant Goldman solicited Plaintiffs' participation therein.

(c)     The Underwriter Defendants also demanded and obtained an agreement from the Company Defendants and the other defendants to indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that the Company Defendants had purchased millions of dollars in directors' and officers' liability insurance.

(d)     Representatives of the Underwriter Defendants also assisted the issuers and other defendants in planning the offerings and had access to confidential corporate information concerning the Company Defendants' operations and financial prospects.

(e)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company Defendants' lawyers, management and top executives and engaged in "drafting sessions" during June, July and August 2015.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish each of the offerings; (ii) the terms of the offerings, including the price at which the securities would be sold; (iii) the language to be used in the offering documents; (iv) what disclosures

- 8 -

1    would be made in the offering documents; and (v) what responses would be made to the SEC in

2    connection with its review of the offering documents.  As a result of those constant contacts and

3    communications between the Underwriter Defendants and the Company Defendants' management and

4    top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have

5    known of, the existing yet undisclosed conditions and material risks detailed herein.

6          48.     The Underwriter Defendants caused certain of the offering documents to be filed with

7    the SEC and declared effective in connection with the offers and sales of securities registered thereby,

8    including those purchased by Plaintiffs.

9    **F.     Doe Defendants**

10         49.     The true names and capacities of defendants sued herein under California Code of Civil

11   Procedure §474 as Does 1-25, inclusive, are presently not known to Plaintiffs, who therefore sue these

12   defendants by such fictitious names.  Plaintiffs will seek to amend this complaint and include these Doe

13   defendants' true names and capacities when they are ascertained.  Each of the fictitiously named

14   defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by

15   Plaintiffs.

16                        **BACKGROUND TO THE OFFERINGS**

17   **A.     SUNE Takes on Billions of Dollars in Debt as It Transforms**
     **Itself into a Renewable Energy Project Developer**

18

19         50.     Between 2013 and 2015, SUNE transformed itself from a manufacturer of

20   semiconductors used in solar panels to a developer of large scale solar, wind, hydroelectric and other

21   renewable energy projects for commercial and industrial customers.  By mid-2015, the transition was

22   largely complete, and SUNE was making preparations to sell off the remaining assets of its legacy

     semiconductor business.

23

24         51.     As part of SUNE's new business model, it took on enormous debt to fund the

25   development and construction of renewable energy projects.  Between the outset of its business

     transition in the second quarter of 2013 ("2Q13") and 2Q15, SUNE's long-term debt climbed by nearly

26

27   300%, increasing from $2.4 billion to $9.2 billion.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

52.     SUNE structured its financing to fund the development and operation of its renewable energy projects in a manner that relied on a complex series of financial transactions. SUNE's financing was designed to permit renewable energy projects to be developed and constructed using short-term financing and then be quickly sold to SUNE subsidiaries that would finance the acquisition through sales of stock or debt securities to investors. As projects were dropped down to its subsidiaries, SUNE's liquidity would then be freed up to pursue other projects.

53.     In 2014, SUNE formed its first yieldco, TERP, to own and operate solar and other renewable energy projects located in North America and Chile. TERP completed its IPO on July 18, 2014. Based on the apparent success of TERP, in November 2014, SUNE's senior insiders caused SUNE to announce that it would form a second yieldco, GLBL, to operate projects in emerging markets, including China, India and parts of Southeast Asia and South and Central America. GLBL completed its IPO on July 31, 2015.

54.     Both yieldcos are dominated and controlled by SUNE, its officers and its board of directors. The SUNE Directors used SUNE's ownership of more than 90% of the voting power of the yieldcos (through the ownership of Class B common stock) to install SUNE executives and other insiders as officers and a majority of the directors of GLBL and TERP. Under management services agreements with the yieldcos, SUNE is responsible for carrying out all day-to-day management, secretarial, accounting, banking, treasury, administrative, liaison, representative, compliance, regulatory and reporting functions and obligations. Pursuant to its Management Services Agreement with GLBL, SUNE, among other things, hires and supervises GLBL's employees; oversees the preparation of GLBL's books and records and financial statements; oversees GLBL's accountants, legal counsel and other accounting, financial or legal advisors; and arranges for individuals to carry out the functions of the principal executive, accounting and financial officers of GLBL for purposes of applicable securities laws and the regulations of any stock exchange on which GLBL securities are listed. SUNE also finances, supports and controls GLBL's operations through other contractual arrangements with GLBL, including a Support Agreement, Project Investment Agreement, Repowering Services Agreement and Interest Payment Agreement.

55.     The yieldcos were designed to return most of the cash flow from the projects to investors in the form of dividends. SUNE was the sponsor of and retained a significant amount of the equity in the yieldcos. SUNE touted both yieldcos as "high growth" entities that would generate consistent and growing dividends from the projects SUNE would develop and drop down.

56.     SUNE asserted that the yieldcos would generate stable dividends due to the lower risk associated with renewable energy plants, which had contracted off-takes with relatively low maintenance costs and were not subject to rising fuel prices like traditional power plants. When GLBL was formed in mid-2015, defendants told investors that GLBL planned to return 85% of its annual cash available for distribution ("CAFD") to investors as dividends and projected it would be able to achieve a compound annual growth rate ("CAGR") in dividends per share ("DPS") of 20% over the three years following its IPO. SUNE and GLBL regularly disclosed CAFD "because," as stated in the registration statement used in connection with GLBL's IPO, "management recognizes that it will be used as a supplemental measure by investors and analysts to evaluate our liquidity."

57.     By virtue of its ongoing equity stake in the yieldcos, SUNE told investors it would continue to share in the cash flow generated by developed projects after they were dropped down to GLBL or TERP. SUNE's ownership interests in its yieldcos gave it the right to receive dividends and additional payments, called incentive distribution rights ("IDRs"), as performance targets were met. Yieldcos thus became the primary vehicle by which SUNE could monetize the projects in its development pipeline. SUNE repeatedly asserted that this retained indirect ownership of its renewable energy projects allowed it to realize greater value than it could by simply developing and selling the projects outright to third parties.

58.     To grow dividends, SUNE needed to be able to continue to develop and drop projects down to the yieldcos. To assure investors that it could do so, SUNE provided each yieldco with a "call rights list" that provided the yieldco with a right of first offer ("ROFO") on specified projects in SUNE's development pipeline. These lists could include projects SUNE had developed on its own as well as projects it had acquired from other entities. The projects on the call rights list, together with forecasts of other projects in SUNE's development pipeline, were used to provide investors with forecasts of CAFD, DPS and megawatt ("MW") growth. SUNE also told investors that the increased

- 11 -

1   dividends and IDRs resulting from those projects would exceed the value of any profits it sacrificed by

2   selling the projects to yieldcos at prices that were lower than what it could have realized on the open

3   market.

4       59.    To succeed, SUNE's plan required that projects be dropped down at prices that would

5   allow the yieldco to realize an internal rate of return ("IRR") in excess of its cost of capital and thereby

6   result in spreads that would generate substantial CAFD per share and fuel dividend payments to

7   investors. SUNE repeatedly told yieldco investors that SUNE would sacrifice sales margins on dropped

8   down projects where needed to provide an IRR that would permit the yieldco to meet its CAFD and

9   DPS growth targets. SUNE also told investors that such sales would increase the dividends and IDRs it

10  received from its equity stake in the yieldcos by an amount that would exceed the value of foregone

11  margins on such sales.

12      60.    The ability of the yieldcos to access equity and debt markets at attractive terms to fund

13  project acquisitions from their parent was thus critical for SUNE given its highly leveraged balance

14  sheet. The inability of the yieldcos to do so, or the inability of SUNE to drop projects down at high

15  enough IRRs, would necessarily result in insufficient CAFD to fund expected dividend growth, stalling

16  SUNE's growth, tying up its liquidity, and giving rise to risk of default on its borrowing arrangements.

17  Thus, SUNE's balance sheet, capital structure, liquidity and financial strength were critical to potential

18  investors.

19      61.    SUNE represented to investors that its liquidity and financial strength gave its

20  Renewable Energy Development Segment, or "DevCo," the ability to finance the development or

21  acquisition of projects that could be dropped down to GLBL and TERP at prices that provided an IRR

22  that would generate CAFD sufficient to meet DPS growth forecasts. To further assure investors about

23  its liquidity, in 2015 SUNE announced plans to launch more than $2.5 billion of warehouse financing

24  facilities that could hold projects between the time they were completed and the time they were dropped

25  down to one of the yieldcos. SUNE told investors that the warehouses protected the yieldcos from

26  being forced to go to the capital markets when lending conditions were unfavorable and protected

27  SUNE from having its liquidity tied up in completed projects awaiting acquisition.

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

62.     In fact, by the summer of 2015, SUNE's liquidity was significantly worse than publicly represented.  Contrary to defendants' representations, SUNE lacked sufficient liquidity to acquire and construct the projects needed to meet its growth estimates, or to drop those projects down to its yieldcos to meet their forecast CAFD and DPS estimates.  Moreover, the price of the yieldcos' stock had declined, and their ability to access the financial markets at economic rates of return had declined, significantly worsening SUNE's liquidity position and eliminating its ability to meet the MW, CAFD and DPS growth estimates defendants had led the market to expect.  Despite this, and even as SUNE breached the debt covenants in its borrowing agreement and found itself needing to borrow acquisition funds at an effective interest rate of nearly 15% (or a rate equal to 1,700% of the going 1-year LIBOR rate), defendants continued to misrepresent the strength of SUNE's liquidity, which permitted it to raise more than $2.5 billion by selling SUNE and GLBL securities to Plaintiffs and other investors.

**B.      SUNE Leverages Its TERP Interests to
          Obtain a $410 Million Margin Loan**

63.     On January 29, 2015, SUNE completed the $2.4 billion acquisition of First Wind LLC.  Funding for the acquisition included a $410 million two-year loan (the "Margin Loan") from Deutsche Bank AG, Goldman Sachs Lending Partners LLC, Barclays Bank plc, Morgan Stanley Bank, N.A. and MIHI LLC.  Goldman also served as a broker on the deal.  Additional acquisition financing was provided by the sale of $337 million SUNE 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes").

64.     SUNE was the exclusive owner of TERP's Class B shares, which were convertible to shares of TERP's publicly traded Class A common stock.  Both the Margin Loan and the Exchangeable Notes were secured by SUNE's interests in TERP Class B securities, consisting of its 62.7 million shares of Class B stock, Class B units and IDR rights in TERP.  Specifically, with respect to the Margin Loan, SUNE initially pledged 32.2 million shares of its Class B stock and units and 50% of its IDRs as collateral.  Both agreements also required SUNE to post additional collateral if the value of the Class B securities – as measured by the public trading price of TERP Class A stock – fell below specified levels.

65.     The Margin Loan provided for debt covenants that required: (i) the value of TERP common stock to remain above a specified value (the "Market Value Trigger"); and (ii) the loan-to-

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    value ratio of TERP common stock relative to the total borrowings under the loan be maintained above

2    a specified level (the "Margin Trigger Level"). If TERP's stock price fell below the Market Value

3    Trigger, SUNE was required to **prepay in full** all outstanding indebtedness on the loan **the next**

4    **business day**. If the loan-to-value ratio exceeded the Margin Trigger Level, SUNE was required to

5    either prepay the loan or provide additional cash collateral to bring the Margin Trigger Level down to

6    the permitted level by 5 p.m. on the second business day after the limit was exceeded. In addition, by 5

7    p.m. of the first business day after the covenant violation, SUNE was required to provide an irrevocable

8    notice of its intent to either prepay the loan or post additional collateral, along with "a description, in

9    reasonable detail of the source of such prepayment and/or such Margin Cash Collateral."

10         66.    The Market Value Trigger, Margin Trigger Level and related terms of the agreement

11    (including the "Margin Initial Level," "Margin Reset Level" and "Margin Release Trigger") were

12    defined in a side letter agreement that was **not** publicly disclosed or privately provided to Plaintiffs.

13    SUNE's 1Q15 Report on Form 10-Q filed with the SEC on May 7, 2015 stated that the loan required

14    SUNE to maintain a loan-to-value ratio not to exceed 50% (meaning it had to post at least $2 in

15    collateral for each $1 borrowed under the agreement).

16         67.    Neither the 1Q15 Report on Form 10-Q nor any other publicly filed document specified

17    the collateral values or the method of their calculation with sufficient specificity to permit Plaintiffs or

18    other investors to determine at what stock price the Margin Trigger Level or Market Value Trigger or

19    other debt covenants would be breached.

20         68.    The Margin Loan and Exchangeable Notes were also falsely classified in SUNE's 1Q15

21    and 2Q15 Reports on Form 10-Q as debt that was "Non-recourse to SunEdison." SUNE's 3Q15 Report

22    on Form 10-Q later corrected the entries to identify both agreements as recourse debt, thereby admitting

23    that defendants had understated the amount of SUNE's recourse debt by $740 million on its prior

24    financial statements.

25    **C.**    **SUNE Prepares to Launch GLBL by Selling $510 Million in**
            **Preferred Class D Securities and Taking on More than $1 Billion in Debt**

26

27         69.    On May 7, 2015, SUNE announced the GLBL IPO and filed with the SEC a preliminary

   registration statement on Form S-1 (the "GLBL Class D Registration Statement").

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

70.     The GLBL Class D Registration Statement repeatedly emphasized the purported advantages of GLBL's relationship with SUNE, including that GLBL would "have access to the significant resources of our Sponsor to support the high-growth strategy of our business." The GLBL Class D Registration Statement represented that the company would "[m]aintain sound financial practices" and "maintain [its] commitment to disciplined financial analysis and a balanced capital structure," including through "a financing policy focused on achieving an optimal capital structure through various capital formation alternatives to minimize interest rates, refinancing risks and tax withholdings." It also emphasized SUNE's asset development track record, including its expertise in acquiring and financing renewable energy project developments since TERP was formed, and included a detailed "call rights list" identifying the projects SUNE would acquire to form GLBL's start-up portfolio and permit GLBL to post similar growth.

71.     The GLBL Class D Registration Statement did not disclose that SUNE lacked the liquidity to acquire the projects for GLBL's start-up portfolio, or that it had falsely identified approximately $740 million of its long-term debt as non-recourse obligations.

72.     Also on May 7, 2015, SUNE announced that it had raised $175 million by selling 175,000 Class D units ("GLBL Class D Securities") to three institutional investors. SUNE said it would use the proceeds of the GLBL Class D offering, together with $362 million in non-recourse debt financing announced the same day, to acquire solar and wind power assets in Brazil and elsewhere to form GLBL's initial portfolio of projects.

73.     On May 11, 2015, additional funding for GLBL's start-up portfolio was announced when SUNE said it would sell $750 million in convertible senior notes to acquire projects for GLBL and set up a warehouse financing facility.

74.     Leading up to the GLBL Class D offering, Barclays communicated with Plaintiffs, indicating there was an opportunity for Plaintiffs to participate in the offering and purchase GLBL Class D Securities.

75.     On or about June 9, 2015, Plaintiffs (along with other GLBL Class D Securities purchasers) purchased GLBL Class D Securities in the GLBL Class D offering. In connection therewith, Plaintiffs signed and entered into a Unit Purchase Agreement for the purchase of GLBL

- 15 -

1   Class D Securities with GLBL (the "GLBL Class D Purchase Agreement"), a Third Amended and

2   Restated Limited Liability Company Agreement (the "GLBL LLC Agreement"), and related

3   agreements. The agreements provided for the purchase of 335,000 GLBL Class D Securities at a price

4   of $1,000 per share, raising $335 million that was to be used to purchase renewable energy project

5   assets for GLBL's initial project portfolio or pay off project debt.

6        76.    In §4 of the GLBL Class D Purchase Agreement, GLBL represented and warranted, as a

7   material inducement to Plaintiffs' purchase of GLBL Class D Securities, that the GLBL Class D

8   Registration Statement did not contain any material misstatements or omissions and that there had been

9   no material changes in the company's business since December 31, 2014.

10        77.    Section 9.10 of the GLBL LLC Agreement provided that, upon the completion of

11   GLBL's IPO, GLBL had discretion to convert the GLBL Class D Securities into shares of GLBL

12   common stock using a conversion ratio that provided holders with a 5% discount from the public IPO

13   price. If the securities were not converted by May 5, 2019, GLBL could thereafter elect to repurchase

14   the units at the greater of their liquidation or fair market value. The parties also entered into a Lock Up

15   Agreement and a Registration Rights Agreement providing that: (i) any converted shares received by

16   GLBL Class D Securities holders would be in the form of Rule 144 restricted (unregistered) stock that

17   could not be publicly traded until six months after the public offering; and (ii) thereafter, the holders of

18   converted restricted stock could demand, subject to certain conditions and requirements, that GLBL

19   register and offer their shares for public sale.

20        78.    On June 16, 2015, SUNE publicly announced the GLBL Class D offering in which

21   Plaintiffs participated. SUNE also announced that it had entered into an agreement to raise an

22   additional $67.5 million through a placement of its Class A common stock that would be completed at

23   the time of its IPO for those shares.

24   **D.    SUNE Incurs Billions of Dollars in Debt and Obligations to Acquire**
          **Projects to Drop Down to GLBL and TERP and Misrepresents**

25             **that It Has Ample Liquidity to Do So**

26        79.    On June 16, 2015, SUNE announced it had signed an agreement to acquire Continuum

27   Wind Energy Limited, which owned 412 MW of wind power projects operating and under development

28   in India and 1,000 MW of wind projects under development. In a separate announcement the same day,

1   SUNE announced that it would acquire Globeleq Mesoamerica Energy, owner of 405 MW of wind and

2   solar projects operating or under development in Central America and 246 MW of wind projects under

3   development. SUNE said that all of the projects from both acquisitions were to be placed on the GLBL

4   call rights list. Terms of and financing arrangements for the transactions were not announced.

5          80.    On June 29, 2015, SUNE announced that it had acquired 521 MW of wind power plants

6   located in Idaho and Oklahoma from Atlantic Power and had formed a $525 million warehouse

7   financing facility to hold the assets pending dropping them down to TERP. The warehouse was

8   structured by Goldman, Morgan Stanley and Citigroup to provide financing for the acquisition via a

9   seven-year term loan funded by Macquarie, John Hancock and SUNE. SUNE CFO Wuebbels was

10  quoted in the release as stating that the warehouse "provides repeatable and scalable funding," and

11  SUNE expected to add additional warehouse facilities to house future acquisitions.

12         81.    On July 6, 2015, SUNE announced a $2 billion agreement to acquire 930 MW of wind

13  power plants from Invenergy Wind LLC. The agreement called for TERP to acquire 460 MW through

14  a combination of cash on hand and bond financing and assume $450 million in project debt. The

15  remaining 470 MW was to be acquired by a new SUNE warehouse financing facility, to be held for

16  later drop down into TERP. TERP raised its 2016 dividend guidance from $1.53 to $1.70 based on the

17  acquisition, representing 26% growth over its 2015 dividend.

18         82.    On July 15, 2015, GLBL entered into an agreement to acquire the rights to three wind

19  and hydropower projects in Brazil from Renova Energia for cash and GLBL common stock upon the

20  completion of GLBL's IPO. The transaction was initiated in May 2015 when GLBL signed a sale and

21  purchase agreement for the three Renova projects. In connection with GLBL's IPO, GLBL committed,

22  subject to certain conditions, to acquire 12 additional Brazilian wind and hydro projects from Renova

23  over the following four years. GLBL also acquired a 15% ownership interest in Renova from Light

24  Energia, S.A. for $250 million, payable in shares of SUNE common stock. SUNE publicly announced

25  the deal on July 21, 2015.

26         83.    On July 20, 2015, SUNE announced the $2.2 billion acquisition of U.S. residential solar

27  installer Vivint Solar ("VSLR"). In connection with the announcement, SUNE forecast that it would

28  complete 4.2-4.5 gigawatts ("GW") of projects in 2016, a roughly 50% increase from previous guidance

- 17 -

of 2.8-3.0 GW.  The VSLR deal called for TERP to finance $922 million of the acquisition price for cash by issuing $737 million in common stock to the public and borrowing $225 million to acquire 523 MW of VSLR solar system assets.  The remainder of the financing was to be provided by SUNE through a $500 million secured debt facility, the issuance of $370 million in common stock, $350 million in convertible notes and $57 million in cash.

84.     Negotiations to finalize the terms of the VSLR acquisition were underway before the June 9, 2015 sale of GLBL Class D Securities to Plaintiffs.  The VSLR acquisition was originally proposed by Domenech in a phone call with VSLR's CEO on March 6, 2015.  Transactional due diligence for the transaction commenced by March 26, 2015.  Following negotiations in May 2015, SUNE submitted an offer to acquire VSLR on June 3, 2015, and proposed an exclusive negotiating period to finalize the terms of the transaction.  After further negotiations leading to a preliminary agreement on the acquisition price, on June 8, 2015 – the day before the closing of the GLBL Class D offering – SUNE and VSLR signed a confidentiality agreement opening a four-week exclusive period to finalize the deal terms.  During those negotiations, SUNE told VSLR that it lacked the liquidity necessary to complete the transaction on the terms agreed and would need to obtain substantial additional financing in order to consummate the transaction.  Notwithstanding the foregoing, SUNE did not negotiate a financing contingency or condition.  Neither did it disclose the insufficiency of its liquidity to Plaintiffs or other investors.

85.     The July 20, 2015 announcement of the VSLR acquisition described the substantial financing that would be required to permit the merger to go forward, causing some investors to question whether SUNE had the ability to raise the capital needed to complete the merger and also fund the acquisition, development and construction of the other projects needed to meet the high-growth expectations it had set for GLBL and TERP, and to do so on terms that would permit completed projects to be dropped down to the yieldcos at IRRs that would be sufficient to fund the CAFD and DPS growth defendants had led the market to expect.  Market concern over the acquisition was heightened by the increased risks associated with residential solar, which was a significant shift in SUNE's existing business that targeted commercial and industrial projects that had stronger counterparties and less risk. TERP's failure to raise dividend guidance to the level that was imputed by the combined assets of

- 18 -

1    VSLR and TERP further fueled concerns over the transaction. These and other concerns over the deal

2    caused the price of both SUNE and TERP shares to decline significantly following the announcement of

3    the VSLR acquisition.

4         86.     By the end of trading on July 21, 2015, the price of SUNE common stock had fallen

5    nearly 7% from its pre-announcement level to close at $29.37 per share while the price of TERP shares

6    had fallen by more than 9% to close at $33.71 per share.

7         87.     Continued declines in the price of SUNE and TERP shares led TERP to announce on

8    July 27, 2015 that it would not issue new shares to finance the acquisition, but would instead do so with

9    a combination of cash on hand and increased debt. To further allay concerns, a conference call was

10   convened that day in which TERP's CEO Domenech and CFO Alex Hernandez (a former Managing

11   Director in the Investment Banking Division of Goldman) represented to investors that TERP and

12   SUNE had adequate liquidity to carry out all of the recently announced acquisitions. Alex Hernandez

13   asserted that TERP shares were "significantly undervalued" as a result of recent market activity, which

14   had resulted from "misconceptions [about the VSLR acquisition] that are apparent from a number of

15   inquiries we have received." He asserted that the company had "ample liquidity and a conservative

16   capital structure," "full flexibility to deploy this liquidity to fund the pending transactions and the

17   overall growth of our business," and the ability to do so "in a disciplined manner that is consistent with

18   our financial policy and strategic objectives." Alex Hernandez also confirmed that TERP had sufficient

19   cash flow to meet both its 2015 and 2016 dividend and CAFD guidance without issuing additional

20   equity, asserted that its dividend forecasts were conservative, and claimed that its CAFD forecasts for

21   the transaction were still reliable despite the increased debt required by the restructured deal announced

22   on the call.

23        88.     By the close of trading on July 31, 2015, the price of both SUNE and TERP shares fell to

24   $23.28 per share and $30.16 per share, respectively, triggering, or causing an imminent risk of

25   triggering, a substantial margin call on the Margin Loan, which fact was not disclosed to investors.

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

**E.    As Its Liquidity Deteriorates, SUNE Proceeds with the GLBL IPO and GLBL Bond Offering.**

89.    On July 19, 2015, GLBL filed an amended registration statement in connection with the GLBL IPO. The registration statement asserted that GLBL would be a "high growth" company that would distribute 85% of its CAFD as dividends to investors, starting with an initial quarterly dividend of $0.275 per share ($1.10 per year) and growing its dividends by a 20% CAGR based on the strength of SUNE's liquidity and capital resources and its ability to continuously acquire, develop and construct renewable energy projects to add to GLBL's portfolio.

90.    On July 29, 2015, GLBL sent letters to the SEC requesting acceleration of the effective date of the registration statement to July 30, 2015, at 4 p.m., or as soon thereafter as possible. At the time the request for acceleration was submitted, defendants were aware or should have known that SUNE's 2Q15 results would be significantly below market expectations, as described below. They were aware or should have known of the breach or impending breach of the Margin Loan debt covenants and/or declined to disclose SUNE's inability to meet the margin call on the loan without borrowing to do so.

91.    Following the July 19, 2015 announcement, GLBL, SUNE and the GLBL Bond Underwriters immediately commenced a road show seeking to encourage investors to participate in the GLBL IPO and GLBL Bond Offering. A team of company representatives, including Alex Hernandez, TERP CFO; Avenier, GLBL CFO; Manu Sial, SUNE Senior Vice President of Finance; and Robert Morris, SUNE Vice President of Investor Relations, solicited investors in a teleconference call on July 23, 2015 and during presentations in London on July 22, 2015, New York on July 23 and 24, 2015, Boston on July 27, 2015, Los Angeles on July 28, 2015 and July 29, 2015, and San Francisco on July 29, 2015. Another team of representatives, including Kevin Lapidus, SUNE Senior Vice President, and Adam Kuehne, GLBL Director of Capital Markets, solicited investors during presentations in Hong Kong on July 21, 2015 and Singapore three days later.

92.    The GLBL Bond Underwriters structured the GLBL Bond Offering, drafted and disseminated the offering materials and orchestrated the roadshows, and received millions of dollars in fees and commissions for underwriting the GLBL Bond Offering.

- 20 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

93.     During the July 20-29, 2015 road show ahead of the offering, SUNE continued to represent to investors that it had sufficient liquidity to run its business.  For example, on July 21, 2015, Plaintiffs' representatives met with management of SUNE, TERP and GLBL in a large group meeting, during which defendants downplayed the negative market reaction to the VSLR acquisition, attributing it to "the ineffective communication of the transaction benefits" and asserted that this acquisition would "generate consistent CAFD long-term."

94.     The registration statement for the IPO, as amended, was declared effective on July 31, 2015 (the "IPO Registration Statement").  On August 4, 2015, GLBL filed with the SEC the prospectus for the IPO (the "IPO Prospectus" and, together with the IPO Registration Statement, the "IPO Offering Materials").  As set forth in more detail in ¶¶203-206, 209, 211, 213, 215 below, the GLBL Bond Offering Memorandum, Free Writing Prospectus and oral communications (the "GLBL Bond Offering Materials") emphasized that GLBL was a "high growth" company primed to rapidly expand its business and grow dividends by 20% annually as a result of its access to SUNE's financial resources, its ability to raise capital, its experience in structured financing for the acquisition and development of renewable energy projects, and its commitments to develop projects that would permit GLBL to attain its targeted growth.

95.     The IPO Offering Materials and GLBL Bond Offering Materials contained untrue statements of material fact and omitted other material facts necessary to make the statements made therein not misleading, including:

(a)     that SUNE had already agreed to structure the 15% Goldman Loan (as defined below) to acquire projects for GLBL's start-up portfolio;

(b)     that the debt covenants in the Margin Loan had been breached, or were in imminent danger of being breached;

(c)     that SUNE lacked sufficient cash to meet the operating needs of its business;

(d)     that SUNE lacked sufficient liquidity to acquire the projects that were to form GLBL's initial start-up portfolio; and

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

(e)     that even where the offering materials purported to warn investors of risks to GLBL's success, those "risk disclosures" were themselves misleading as they described the "risks" as contingent on uncertain future events when, in fact, the events warned of had already come to pass.

96.     On July 31, 2015, defendants raised almost $1.5 billion in the IPO and GLBL bond offering, selling 45 million shares of GLBL Class A common stock at $15 per share in the IPO for gross proceeds of $675 million (the "GLBL IPO") and selling an additional $810 million of 9.75% GLBL bonds (the "GLBL Bonds" and the "GLBL Bond Offering"). Plaintiffs purchased the GLBL Bonds from JP Morgan in the GLBL Bond Offering pursuant to the GLBL Bond Offering Materials.

97.     Also on July 31, 2015, GLBL's board exercised its discretion under §9.10(c) of the GLBL LLC Agreement to force Plaintiffs to surrender their GLBL Class D Securities in exchange for restricted shares of GLBL common stock, requiring Plaintiffs and all other holders of GLBL Class D Securities to tender their units to GLBL for conversion to restricted common stock. Pursuant to this requirement, Plaintiffs sold their GLBL Class D Securities to GLBL according to the formula set forth in the GLBL LLC Agreement and were required to simultaneously use the proceeds to purchase shares of restricted GLBL common stock.

**F.     Unbeknownst to Investors SUNE Borrows $169 Million from Goldman at an Astounding 15% Interest Rate to Finance the Acquisition of GLBL's Start-up Projects**

98.     On August 11, 2015, SUNE entered into an agreement for a one-year term loan from Goldman Sachs Bank USA to borrow $169 million at a rate of 9.25% and pay the lender an origination fee of $9 million (5.3%), equating to an effective interest rate of 15% (the "15% Goldman Loan"), *or more than 14 percentage points over the then-prevailing LIBOR one-year rate of 0.8467%.* By comparison, the credit facilities adequately disclosed in SUNE's 2Q15 Report on Form 10-Q required the company to pay from 1.25 percentage points to 4.25 percentage points over LIBOR.

99.     Neither the existence of the loan nor its terms were disclosed publicly or to Plaintiffs until three months later on November 9, 2015, when SUNE filed its 3Q15 Report on Form 10-Q, which described the loan as follows:

> On August 11, 2015, we entered into a Second Lien Credit Agreement ("Second Lien Term Loan") with Goldman Sachs Bank USA ("Goldman Sachs"), providing for a term loan maturing on August 11, 2016, in an aggregate principal amount of $169 million. As of September 30, 2015, the current interest rate on the Term Loan is

9.25%. . . . We paid fees of $9 million upon entry into the Second Lien Term Loan which were recognized as deferred financing costs.

100.    On November 18, 2015, Deutsche Bank reported that SUNE management had admitted that the 15% Goldman Loan had been "structured in July as part of the portfolio formation for the GLBL IPO. The company entered into the loan in August as part of the initial agreement in order to fund the construction of some of the international projects."

101.    Given the concerns in the market following the announcement of the VSLR acquisition, the disclosure that SUNE needed to borrow funds at 15% in order to fund construction of the projects in GLBL's start-up portfolio would have immediately alerted investors that the projects could not be economically dropped down at a cost that would allow GLBL to generate an IRR that exceeded its cost of capital and generate dividend yields or growth in the amounts forecast. As a result, Plaintiffs and others would have understood that GLBL lacked the ability to meet its MW, CAFD and DPS growth forecasts. That SUNE needed to borrow funds at a 15% rate was a tacit admission, or at a minimum a red flag, that the representations about SUNE's financial strength, liquidity and capital resources, and the benefits GLBL would derive as a result thereof, were false. As a result, demand for GLBL's IPO shares, which had already fallen significantly following the VSLR acquisition announcement, would have dissipated along with demand for any subsequent offerings of SUNE securities.

**G.    Five Days After the GLBL IPO Is Completed, SUNE Reports a Widening Second Quarter Loss that Increases the Risk of a Margin Loan Default, but Represents to Investors that Its Liquidity Remains Strong**

102.    On August 6, 2015, SUNE issued its 2Q15 financial results, reporting strong growth but a net loss of $263 million ($0.93 per share), which was more than five times larger than the loss reported in 2Q14. Even excluding one-time items, the $0.74 loss per share was significantly wider than the $0.51 loss expected by analysts.

103.    On August 6, 2015, SUNE conducted a conference call with investors to discuss the 2Q15 results with investors, during which:

        (a)    Chatila, Wuebbels, Domenech and Alex Hernandez spent the majority of the call attempting to focus investors on the company's MW and DPS growth and representing to investors that

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  SUNE's existing liquidity sources were sufficient to fund operations and meet 2015 and 2016 financial

2  forecasts without additional offerings or borrowings.

3          (b)     Chatila, in reaction to investor concerns over potential increases in interest rates

4  and tighter capital markets, asserted at the outset of the call that SUNE's financial platform had been

5  designed so that "in times of dislocation like those recently seen in the YieldCo financing space" SUNE

6  could still provide "attractive growth" for the yieldcos "by providing drop-down projects at high IRRs

7  that are well above the vehicle's cost of capital."

8          (c)     Wuebbels repeatedly stated that SUNE had a "strong liquidity position," that

9  SUNE and TERP had $2 billion in cash and that "multiple pools of capital []are at our disposal to

10  continue to fuel our growth."  Wuebbels concluded his opening remarks at the outset of the call by

11  telling investors that SUNE "can economically drop projects at a significant spread to [TERP's] cost of

12  equity and cost of capital" resulting in "IRRs well above its cost of capital," and that the "same type of

13  model holds for our ability as a developer to drop projects to [GLBL] at attractive spreads to its cost of

14  capital while still benefitting at the sponsor level as well."

15          (d)     Domenech stated that TERP's liquidity was "more than sufficient to support our

16  growth needed to reach 2016 targets."

17          (e)     Alex Hernandez claimed that the company "operated with a conservative balance

18  sheet with debt levels well below target while also maintaining significant liquidity," and that "the

19  Company is in a very strong liquidity position and . . . our cost of funding remains low as a result of

20  this disciplined strategy."  He also noted that "we purposely run the business so we can weather periods

21  of market dislocation," and said that the company's "current portfolio and announced acquisitions are

22  sufficient to deliver 2016 DPS in excess of our $1.75 guidance without incremental equity."

23      104.   Defendants maintained their bullish stance when analysts questioned their growth and

24  spending plans. For example, when one analyst asked whether defendants would need to raise equity to

25  fund SUNE's 2016 growth plans, Wuebbels responded by touting the company's financial strength and

26  expertise: "So we continue to add to the firepower of the Company, and I think that's the thing that you

27  would notice mostly with SunEdison, is that our ability to innovate on capital structures and on being

28  able to build out this growth in a capital efficient manner is what really differentiates us. And I think

- 24 -

that will continue." After repeated questioning by analysts as to whether additional financings would be required to meet forecast growth, Wuebbels answered directly that no additional corporate financing would be needed, noting that *"we don't see any additional financings to be able to achieve this growth."*[2]

105.    Following these exchanges, one participant asked whether the declining share price of SUNE and its yieldcos had given rise to "an opportunity for creating additional value for shareholders by capitalizing on the short-term pessimism in the Market." In response, Chatila and Wuebbels both strongly reaffirmed that the liquidity and financial strength of the company fully supported their bullish outlook for the business:

> [Chatila:] I will tell you two things. Number one, in this kind of dislocation, the strong get stronger. We are a lot more well set, better set than other people. And you can see from our ability to develop organically, having the Yieldcos that we have, the only international Yieldco around in solar and wind. So because of that, we're very well set. The second thing I'll tell you is we are – the focus that I have on my mind is two things right now. Number one of course is to execute the next six quarters. And number two is to ensure the yield on TerraForm Power and TerraForm Global is impeccable. And we're going to ensure that the drop-downs are at a significant wide width of – versus the weighted average cost to capital of these vehicles. So we're going to continue to perform in that regard. I don't know, Brian, if you want add any comments.

> [Wuebbels:] No, I think, Lee – I think you said it well. For us, these moments of dislocation provide opportunities. I think for us, though, the most important thing at this moment is execution. For us, we have been very successful in doing accretive acquisitions. But at moments like this for us the most important thing, I think it's what we tried to bring focus back on this call, was that the underlying operations of the Company are strong. It's what has gotten us to this point. We haven't taken our eye off the ball. We are integrating all of these assets extremely well. And the underlying fundamentals, whether it's the operation of the fleet within TerraForm Power or the execution of margins within SunEdison or the OpEx leverage that we're getting in SunEdison are unchanged. So to me, that's how I see it. I think we see opportunities in this space, and we're not going to stop.

> [Chatila:] There's two ways to execute in business. Number one is to really do the operational execution, be focused, so on and so forth, [b]ut even a more important one is to design a formula that makes money all the time. So when you look at a lot of our acquisitions or change in structure, it's to give us the strategic depth to never miss. If you look actually how what [sic] Carlos and Alex have done in TerraForm Power, the way they have distributed the assets so well, because of that structure they're going to be better performing. And we will continue to do these kind of moats in our business all the time. So on the surface looks like it's a lot of things. Reality is we are de-risking the business as time progresses by having many sources of volume growth, many sources of cash flows, many vehicles so we can drop down our assets and never have to sell projects to other people and make less money. And that's why we feel very

---

[2]    Here as elsewhere emphasis has been added unless otherwise indicated.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  confident about our execution.  Not only because of the operations, which we are
2  maniacal about, but also the way we design the formula.

3    [Wuebbels:]  I think the last piece, Lee, that I will mention is, we said this previously.  As we get into the deeper parts of the dividends coming back to the parent and the IDRs, that clearly we're going to articulate to our shareholders the capital strategy of how we're going to return that capital to our shareholders, whether it's to be through a buyback or whether it's going to be through a dividend.  So we're still working on that.  The GP conversation, we didn't put a lot of focus on it during this call because we wanted to focus on execution, but that is still front and center.  We have full intention, as we get into the IDRs, of returning that capital back to our shareholders.

7    106. The statements quoted above, and other similar representations on the call, caused

8 investors to believe that SUNE's liquidity and capital resources were sufficient to fund its operations

9 and acquire the projects needed to support GLBL's and TERP's promised growth, as reflected by

10 analyst commentary after the call.  *See, e.g.,* UBS, *Assessing the Aftermath*, Aug. 7, 2015 ("Liquidity

11 remains a further focus – mgmt likely to act to quickly expand credit. . . . Bottom line, this appears

12 more of a perception than a reality . . . ."); *see also* Deutsche Bank, *Panic Selling Creates Great Buying*

13 *Opportunity*, Aug. 11, 2015; Credit Suisse, *Addressing Bear Thesis Head On: SunEdison Has Access to*

14 *Capital to Generate Returns*, Aug. 12, 2015; RBC Capital Markets, *Well prepared to weather a perfect*

15 *storm*, Aug. 13, 2015.

16    107. On August 6, 2015, after SUNE and TERP management's 2Q15 earnings call with

17 analysts, Plaintiffs had follow-up calls with SUNE CFO Wuebbels and TERP CEO Domenech, during

18 which Wuebbels downplayed liquidity concerns, asserting that SUNE's then existing warehousing

19 facilities anticipated much of SUNE's liquidity needs.

20    108. On August 10, 2015, Plaintiffs had a follow-up call with SUNE investor relations, during

21 which SUNE representatives stated that SUNE represented that it did not expect significant working

22 capital needs beyond what was already in place as of June 30, 2015.

23 **H.** **SUNE Does Not Disclose a Breach of the Debt Covenants on the Margin Loan**

24    109. The falling price of SUNE and TERP shares following the July announcement of the

25 VSLR acquisition prompted large margin calls on the Margin Loan.  By August 4, 2015, two days

26 before 2Q15 earnings were announced, TERP shares had fallen nearly 14% below their value on the

27 day the Margin Loan was closed.  Thus, by the time of the 2Q15 call, the breach of the Margin Loan

28 debt covenants had either already occurred or was imminent.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

110.   The margin call was not publicly disclosed by SUNE at the time it occurred. On August 25, 2015, UBS reported that it had learned that a margin call had been made on the loan but had been satisfied by SUNE and that UBS presumed it had been satisfied by pledging additional Class B shares as collateral. SUNE did not file a Report on Form 8-K with the SEC as required at the time it advised UBS of the Margin Loan breach and margin call and did not itself report the margin call until October 7, 2015, when it admitted that a $152 million call had previously been made on the Margin Loan and was satisfied by posting cash, not shares, as additional collateral.

111.   While defendants did not disclose the source of the cash used to satisfy the call, the following facts indicate that the margin call was satisfied from the proceeds of the 15% Goldman Loan: (i) the 15% Goldman Loan was signed August 11, 2015, which would have been the deadline set by the Margin Loan agreement to cure the violation if the breach occurred on August 7, 2015[3]; (ii) the size of the loan ($169 million) is roughly the same as the size of the call ($152 million), which is consistent with the need to post additional collateral to provide a cushion to prevent further calls as the value of TERP common stock continued to fall; and (iii) Goldman was one of the brokers and lenders on the Margin Loan, and thus knew about the call and the need to raise money to satisfy it. To the extent SUNE satisfied the call by using the proceeds of the 15% Goldman Loan, the disclosure of SUNE's inability to satisfy the call absent borrowing funds at an extraordinary 15% interest rate would have caused investors to disbelieve defendants' statements about the company's liquidity, efficient use of capital and financial strength, and to discredit defendants' bullish outlook for the business.

I.   **SUNE Sells $650 Million in Preferred Stock Without Disclosing the 15% Goldman Loan, the Breach of the Margin Loan and Worsening Liquidity Risks to Investors**

112.   On August 12, 2015, SUNE announced the syndication of an additional $280 million seven-year term loan for the TERP warehouse facility. The proceeds were added to the warehouse

---

[3]   Based on the 50% loan-to-value requirement and using the value of the Class B shares pledged to the loan (but not the value of the Class B units or IDR rights, which are unknown), the covenant appears to have been breached on or about August 7, 2015, when TERP's shares closed at $25.24 per share. SUNE has not disclosed the specific date of the breach. However, based on the 32.2 million Class B shares originally pledged on the Margin Loan agreement and assuming a $410 million loan balance on August 7, 2015, the $25.24 closing price would have equated to a loan-to-value ratio of 50% ($410 million ÷ (32.2 million x $25.24)).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

facility formed in connection with the Atlantic Power acquisition, increasing the warehouse facility to $525 million. Later that day, SUNE announced that it would sell 50% of the cash equity (and 99% of the tax equity) on a 420 MW solar project on TERP's call rights list (the Four Brothers project in Utah) for $500 million to Dominion Resources to raise the capital needed to complete development and construction of the project. Both of these announcements misrepresented that SUNE's financial condition remained strong and it had the ability to raise the capital necessary to fund project development and meet forecast MW, CAFD and DPS growth at its yieldcos, causing the price of both SUNE and TERP shares to rise. SUNE did not disclose the terms or existence of the 15% Goldman Loan or the margin call that had been made on the Margin Loan, resulting in a presentation that misled Plaintiffs and other investors about SUNE's liquidity, access to capital and financial strength.

113. On August 17, 2015, SUNE issued a release announcing a preferred stock offering. The following day, SUNE filed a prospectus supplement (the "Preferred Offering Prospectus") to its September 9, 2013 registration statement on Form S-3 (the "Shelf Registration," and together with the Preferred Offering Prospectus, the "SUNE Preferred Offering Materials") for the $500 million offering of series A perpetual convertible preferred stock ("SUNE Preferred Stock") carrying a 6.75% dividend right (the "SUNE Preferred Offering").

114. The SUNE Preferred Offering Materials contained untrue statements of material fact and omitted other material facts necessary to prevent other statements made therein from being materially misleading as set forth in more detail in ¶¶155-171 below. Among other things, the SUNE Preferred Offering Materials: (i) omitted to disclose the breach of the Margin Loan debt covenants; (ii) omitted to disclose the existence or terms of the 15% Goldman Loan; and (iii) represented that SUNE's existing sources of liquidity were sufficient to operate its business over the next 12 months and to develop the renewable energy projects needed during that period to meet forecast MW, CAFD and DPS growth.

115. Goldman solicited Plaintiffs' participation in the SUNE Preferred Offering. Plaintiffs agreed to purchase SUNE Preferred Stock in the SUNE Preferred Offering.

116. On August 18, 2015, SUNE completed the SUNE Preferred Offering, issuing $650 million shares of SUNE Preferred Stock at the price of $1,000 per share. Plaintiffs purchased SUNE Preferred Stock from the SUNE Underwriters in the SUNE Preferred Offering.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

117.   Had Plaintiffs known about the existence, reasons for, or terms of the 15% Goldman Loan, they would not have purchased SUNE Preferred Stock.

**J.     SUNE's Liquidity Problem**

118.   On August 25, 2015, UBS issued an analyst report disclosing that a margin call had been made on the Margin Loan.  The report, which stated that UBS had learned of the margin call in a discussion with management, did not identify the size of the call, disclose the 15% Goldman Loan, or explain how the call had been satisfied.  The report stated, in relevant part:

**Call on margin loan but still appears to be sufficient collateral**

> Details on the $410Mn margin loan secured by SUNE's TERP LP and GP interest remain scarce but we understand that there has been a margin call made which management has satisfied.  SUNE has taken steps to restructure the loan (we suspect increasing TERP collateral) which it believes will prevent any disruptions to the business going forward.  The original loan agreement requires a 50% minimum loan-to-value ratio implying $205Mn TERP value must be maintained (~9Mn LP shares).

119.   On August 31, 2015, Macquarie and JP Morgan initiated coverage on SUNE with positive ratings.  Both analysts recognized questions about SUNE's liquidity, but concluded, based on management's commentary, that the liquidity risks were overblown.  Macquarie said the Dominion Resources joint venture agreement "should have addressed near-term liquidity concerns for SUNE given its aggressive project development schedule" and dismissed opinions to the contrary as mere speculation: "[G]iven SUNE's high leverage and liquidity concerns surrounding other renewable power developers, the limited clarity of SUNE's disclosures tends to give rise to speculation about its financial standing, especially during times of dislocation in financial markets, like right now."  JP Morgan's report similarly told investors that SUNE stock was undervalued, asserting that the new warehouse facilities provided it with sufficient protection from the yieldcos' falling stock prices and inability to tap capital markets.  "Amid liquidity concerns, we are buyers," the report said, adding that the "Recent sell-off [was] overdone."

120.   The following week (on September 8, 2015), SUNE announced that an agreement had been reached to form a partnership with unnamed institutional investors advised by JP Morgan to provide equity to purchase projects developed by SUNE at "an agreed upfront development margin." Financial terms of the arrangement were not disclosed.  SUNE said that the partnership agreement

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1 | would provide $300 million to fund the purchase of a 33% interest in a 425 MW portfolio of solar

2 | assets owned by Dominion Resources.  SUNE's press release went on to state:

> The partnership also contemplates the acquisition of new development projects into mid-2016, providing an ongoing source of capital for SunEdison projects ready to go into construction or operation.
>
> "This partnership supports SunEdison's growth strategy while strengthening our liquidity," said Paul Gaynor, executive vice president of SunEdison's EMEA and Americas business unit. "Attracting strong investors such as J.P. Morgan Asset Management reinforces the breadth and depth of demand for ownership of renewable energy assets."

121.   Also on September 8, 2015, SUNE announced another joint venture agreement with Dominion Resources to invest $320 million to develop the 265 MW Three Cedars solar project in Utah, on terms similar to the previously announced joint venture on the Four Brothers project, and told investors it would finance the balance of the capital through a loan from Deutsche Bank.

122.   Neither release disclosed the 15% Goldman Loan, or warned that further margin calls on the Margin Loan had occurred or were imminent.

123.   A September 8, 2015 "Company Alert" issued by Deutsche Bank (the administrative agent for, and one of the lenders on, the Margin Loan), rating SUNE stock as a "Buy" in light of the two deals announced that day, stated:

> Both these deals demonstrate SUNE's ability to finance their 2016 projects and increase our confidence in the company's ability to weather the market downturn while executing on the 4.2-4.5GW guidance for 2016. Equity return requirements for the JPM warehouse are likely in the 10-11% range, and we expect the company to pursue similar arrangements for international emerging market projects over the coming quarters, although we think a country-specific fund is more likely for international assets. Furthermore, almost 700MWdc of projects financed with Dominion Resources in several weeks show that there is still ample tax equity appetite in the market, and similar deals with other large utilities are plausible through the end of 2016 should increase investor confidence in SUNE's ability to meet its guidance.  Furthermore, equity investors appear willing to provide a source of liquidity for SUNE projects with the ability to scale, which should allay public investor concerns around financing abilities.

Deutsche Bank, *Deals Show SUNE's Financial Flexibility*, Sept. 8, 2015.

124.   On September 28, 2015, CreditSights issued a report warning that SUNE could be close to a margin call on the Margin Loan.  After analyzing vague loan disclosures spread through four disparate documents (a SUNE 10-Q, a TERP prospectus, a SUNE bond offering, and the Margin Loan agreement), the report concluded that it was "possible" that SUNE could have to post additional

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1  collateral on the loan, but warned that "clear lack of disclosure" made it difficult to reach any firm

2  conclusions:   "It is entirely possible the company and lending bank disagrees with us and/or has

3  amended the loan but we have seen zero disclosure saying this is the case."

4       125.   In a September 29, 2015 research report, JP Morgan wrote that the decline in SUNE's

5  share price over the past week "has been driven primarily by concern over SUNE's $410mm margin

6  loan, collateralized by Class B shares of [TERP]."

7  **K.    SUNE Cancels Projects, Reveals the Margin Loan Breach
          and the 15% Goldman Loan, and Admits that It Had**
8  **          Insufficient Liquidity to Meet the Growth It Forecast**

9       126.   On October 5, 2015, SUNE issued a release and filed a Report on Form 8-K with the

10  SEC announcing that on September 29, 2015, its board of directors had approved a management

11  proposal to restructure operations by cutting its workforce by 15%. *Greentech Media* reported that the

12  initiative was designed to reduce operating costs by 30%.

13       127.   On October 6, 2015, *The Wall Street Journal* reported that SUNE would not complete its

14  $700 million acquisition of Latin America Power ("LAP") and had walked away from the deal after

15  failing to make a $400 million upfront payment.  SUNE told *The Wall Street Journal* that LAP had

16  failed to satisfy a condition precedent to the deal (consummation of a share purchase agreement), a

17  position that Chatila reiterated on a conference call the next day.  LAP's lawyer told *The Wall Street*

18  *Journal* that SUNE's contention was "'baseless.'"  LAP subsequently initiated arbitration to recover at

19  least $150 million from SUNE as a result of the cancellation of the deal, alleging that SUNE failed to

20  complete the acquisition because of "failed business strategies and lack of liquidity."  LAP and SUNE

21  would later settle their disputes with SUNE paying LAP an additional $28.5 million.

22       128.   At 7 a.m. Eastern time on October 7, 2015, SUNE hosted a conference call to discuss the

23  state of its business with investors and market analysts.  Wuebbels admitted on the call that a $152

24  million margin call had been made on the Margin Loan (without disclosing the existence or terms of the

25  15% Goldman Loan that had been made at the time of the margin call) and that the margin call had been

26  satisfied by posting additional cash which was being held in escrow.

27       129.   Wuebbels also said that the loan had been restructured to lower the margin trigger "to a

28  point that is significantly below the current market price." Yet in SUNE's 3Q15 Report on Form 10-Q,

- 31 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1 | filed four weeks later on November 9, 2015, the Company revealed that it had suffered an **additional**
2 | margin call of $91 million in October. But at the time Wuebbels made his October 7, 2015 statement,
3 | TERP's stock had just closed at $17.88 per share (on October 6, 2015), and closed above that price on
4 | every day for the rest of the month save one (October 27, 2015), when it closed slightly lower at $17.64
5 | per share. By contrast, the low for the month had occurred on October 1, 2015, five days before the
6 | call, when TERP's stock closed at $15.32 per share. Thus, Wuebbels either failed to disclose the fact
7 | that a second margin call had occurred by the time he told investors that the collateral was sufficient, or
8 | his assertion that the margin trigger had been reset to a point that was "significantly below the current
9 | market price" was false.

10 |     130.    During the call, SUNE announced that due to the unavailability of financing it was
11 | changing its strategy to focus on selling or long-term warehousing of projects, would not drop any
12 | projects into TERP or GLBL in 2016, and lowered its 2016 MW guidance by 20%. Chatila
13 | nevertheless told investors that SUNE "remains well capitalized with adequate liquidity and the new
14 | optimized economic engine positions us with cash-generating ability that exceeds the liabilities of the
15 | business, including acquisitions and converts."

16 |     131.    Chatila acknowledged on the call that SUNE had been criticized for a lack of
17 | transparency, admitting that "SunEdison's P&L and balance sheet are hard to read and we fully
18 | recognize that," and stating that the company would "improve our investor disclosure, reporting and
19 | transparency to shed light on the quality of our business."

20 |     132.    On November 9, 2015, SUNE filed with the SEC its 3Q15 Report on Form 10-Q. At the
21 | end of the note to its financial statements describing SUNE's DevCo debt, under the heading "Other
22 | Credit Facilities," the 3Q15 Report on Form 10-Q revealed the 15% Goldman Loan to investors, as
23 | quoted in ¶99 above. The Report on Form 10-Q also: (i) revealed that SUNE had been required to
24 | deposit an additional $91 million in cash collateral on the Margin Loan in October 2015 (over and
25 | above the $152 million call that was revealed on October 7, 2015); (ii) disclosed that the amended
26 | Margin Trigger Level was set at a loan-to-value ratio of 40%; and (iii) reclassified the $740 million of
27 | debt under the Margin Loan and Exchangeable Notes as recourse debt, thereby admitting the falsity of
28 | its prior classification of the debt as non-recourse.

133.    On November 17, 2015, TERP's stock closed at $10.32 per share, apparently breaching the Market Value Trigger under the Margin Loan.  The same day, the Margin Loan was secretly amended to waive the trigger for a specified period of time.  In connection with the amendment, SUNE paid the loan down by $307 million.  SUNE paid an additional $21 million in fees on the transaction. The amendment was not publicly disclosed until November 23, 2015.

134.    On November 19, 2015, the Margin Loan was amended again to reset the trigger and provide that, if TERP's stock price reached it again, SUNE would be subject to mandatory prepayment provisions under the loan and/or would be required to post additional cash collateral to bring the loan to value percentage "equal to or less than 0.00%."  The amendment was not publicly disclosed until November 24, 2015.

135.    On November 20, 2015 – the day after the Margin Loan was amended – SUNE wrested control of GLBL and TERP from its existing management by exercising its right to expand the GLBL and TERP boards and appoint three new directors for GLBL and TERP, who then voted to replace the members of GLBL and TERP's Conflicts Committee, leading to the resignation of other GLBL and TERP directors.  GLBL and TERP's board then voted to oust Domenech, Alex Hernandez and other officers and installed Wuebbels as the new CEO.  Following these changes, GLBL tentatively agreed to buy 425 MW of solar projects in India from SUNE for $231 million.  With the votes of the SUNE-appointed directors, GLBL's board agreed that the company would make an immediate upfront payment of $150 million on the transaction even though material terms of the agreement were still being negotiated and the agreement was subject to cancellation if agreement on the terms could not be reached.  The funds were immediately transferred to SUNE, which immediately used $95 million of the proceeds to pay down the Margin Loan.  The remaining $81 million was then transferred to SUNE by year end 2015.  In this way, GLBL was forced by SUNE to transfer $231 million of its cash to SUNE by year end 2015 in the form of a prepay agreement between the two companies, as SUNE was desperate for cash and because of its financial condition could not access the credit markets.

136.    On November 24, 2015, SUNE issued a release announcing that it had repaid all but $5 million of the Margin Loan.  "'We believe a significant portion of the recent volatility around the Company and its subsidiaries has been attributed to the Margin Loan,'" Chatila said in the release.  In

1  Current Reports filed with the SEC on November 23 and 24, 2015, SUNE revealed the amendments to

2  the Margin Loan that had been made on November 17 and 19, 2015.

3      137.    Market analysts quickly realized the transaction for what it was – a desperate attempt by

4  a cash-strapped company to raid its subsidiaries to avoid defaulting on a loan. *See, e.g.,* UBS, *Sun*

5  *Baked*, Nov. 25, 2015 (transaction "points to SUNE's potential cash shortage, given the *immediate* need

6  to pay down the margin loan with upfront cash proceeds, and the lack of liquidity to fund this

7  internally"; "[w]e flag that the cost of capital associated with the term loan and GLBL portfolio sales

8  will be the relative norm for SUNE going forward given the liquidity concerns surrounding SUNE that

9  are permeating the market") (emphasis in original); Deutsche Bank, *Several Overhangs Removed*, Nov.

10  24, 2015 ("SUNE is effectively leveraging its GLBL yieldco to free up cash and deleverage the balance

11  sheet"); JP Morgan, *Loan Paydown and Asset Sales – ALERT*, Nov. 24, 2015 ("[S]ome of the

12  construction risk has now shifted from SUNE to GLBL. GLBL will carry the projects on its balance

13  sheet, but we do not expect the projects to generate CAFD until completion . . . .").

14      138.    As the foregoing events were unfolding, Moody's Investors Service announced on

15  November 23, 2015 that it had downgraded GLBL's credit rating and issued a negative ratings outlook

16  on the company to "reflect the strained liquidity and financial situation at parent Sun Edison" and the

17  "the liquidity stress at and contagion risks from SUNE." Moody's announcement went on to state:

18          Although SUNE reported $1.38 billion of cash on hand as of September 30,
        2015, we estimate that about $700 million of this cash is at various projects currently
19      under construction and *a majority of this amount is not really free cash available to
        meet liquidity needs*. Portions of this cash includes EPC profits retained temporarily at
20      the projects by SUNE, which is normally the EPC contractor for all the projects it
        develops, which we believe is likely available for general liquidity if needed. When we
21      factor in other liquidity demands on SUNE, such as $150-200 million in earnout
        payments to First Wind, an additional $200 million or so to repay a margin loan to
22      Deutsche Bank, Q4 interest expense of about $50 million and $95 million for the
        exercise of a put option on the shares of GLBL by the South American company
23      Renova, *there is very little liquidity cushion at SUNE*. This analysis does not yet
        incorporate whether SUNE's core development operations are a source or use of cash
24      during this quarter.

25      139.    On December 2, 2015, SUNE issued a release announcing that it was terminating the

26  Renova acquisition. The same day a leading business publication in India, *Mint*, reported that SUNE

27  Asia Pacific President Pashupathy Gopalan had said the company was walking away from its agreement

28  to acquire Continuum Wind Energy, and two other sources with knowledge told the newspaper that the

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    company would also be terminating a $4 billion joint venture to build a photovoltaic plant in India.

2    According to the *Mint* article, "Gopalan said SunEdison's balance sheet did not provide for enough

3    capital for the 3.5-3.7 GW global capacity addition planned for 2016, which would need upward of $5

4    billion investment."

5         140.   On January 7, 2016, SUNE announced a series of complex financing transactions to

6    improve its near-term liquidity crisis, ***paying an effective debt cost of more than 20% and diluting***

7    ***shareholder interests by at least 21% to raise funds it needed to repay the 15% Goldman Loan and***

8    ***the Margin Loan and make a required $270 million payout to First Wind***.   SUNE announced it

9    would: (i) borrow $725 million at LIBOR +10% in a deal that also required it to issue 28.7 million

10   share warrants to the lenders; (ii) exchange $580 million of notes for a $225 million convertible note

11   and 28 million common shares; and (iii) exchange 12 million common shares for $158 million in

12   preferred stock.   "Unfortunately," wrote one *Seeking Alpha* commentator, "the details of today's

13   transactions clearly show SunEdison's desperation."

14        141.   As SUNE's massive liquidity problems were revealed, insiders came forward to admit

15   that, in fact, SUNE had lacked a reasonable basis for the forecasts for CAFD, DPS and MW growth it

16   had provided to investors in connection with the offerings described herein, and had failed to disclose

17   facts that would have revealed that the forecasts lacked the basis that a reasonable investor would

18   expect. For example:

19        (a)   On February 29, 2016, SUNE announced that it was unable to timely file its 2015

20   Annual Report on Form 10-K due to "ongoing inquiries and investigations by the Audit Committee of

21   the Company's Board of Directors . . . based on allegations made by former executives of the Company

22   concerning the accuracy of the Company's anticipated financial position previously disclosed."

23   Further, "based on certain additional issues raised by a current and former employee" of SUNE, the

24   Audit Committee initiated an additional investigation into SUNE's anticipated financial position. If

25   found to have merit, SUNE "may be required to reassess the Company's liquidity position as well as the

26   disclosures in the Form 10-K, including ***whether the Company may require greater liquidity than***

27   ***previously anticipated and/or whether the sources are sufficient to meet its requirements***."

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

(b)    On March 16, 2016, SUNE announced a further delay in filing its Form 10-K due to its identification of material weaknesses in internal controls over financial reporting, primarily due to deficient controls over information technology systems used by it and its yieldcos. In a March 29, 2016 Report on Form 8-K, GLBL asserted that SUNE had "not performed as obligated under the Management Services Agreement, in particular with respect to financial reporting and control matters."

(c)    On March 28, 2016, it was revealed that the SEC was investigating SUNE's disclosures to investors about its liquidity, including its overstatement of cash on hand by including amounts tied up in warehouse and project-level financing that was not accessible by SUNE.

142.    Amid the collapse of SUNE's house of cards, additional circumstances were revealed further illustrating that defendants lacked a reasonable basis for their prior statements about SUNE's liquidity and its ability to perform its obligations under the massive amount of debt it was incurring and the numerous projects it committed to developing for GLBL and TERP. For example:

(a)    On March 8, 2016, VSLR initiated a lawsuit against SUNE for breach of contract, alleging that SUNE had failed to consummate the VSLR acquisition. After SUNE had initially agreed to the VSLR acquisition in July 2015, SUNE's financial difficulties caused the parties to reduce the merger consideration in December 2015. Notwithstanding this amendment, SUNE's "failure at almost every turn to satisfy their financing obligations" since the initial merger agreement in July 2015 forced VSLR to terminate the transaction agreement and initiate suit against SUNE.

(b)    In the March 29, 2016 Report on Form 8-K, GLBL revealed that SUNE had not performed or may be unable to perform under its agreements to contribute projects in Uruguay and India to GLBL's initial project portfolio, as agreed prior to the GLBL IPO. The Report on Form 8-K revealed that "there are currently material amounts of project costs and equity contributions for the Uruguay Projects that remain to be contributed by [SUNE] in order to continue construction of the projects and disbursement of the project finance debt facilities."

(c)    In addition, the Report on Form 8-K revealed that the projects in India that GLBL had been forced to purchase in November 2015 to provide SUNE with the cash it needed to retire the Margin Loan were also unlikely to be completed due to SUNE's failure to contribute projects costs and

equity contributions, resulting in extended project delays that made it unlikely that the projects would be completed or added to GLBL's portfolio.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the 1933 Act in Connection with the
### SUNE Preferred Offering Against SUNE, Chatila,
### Wuebbels, Truong, the SUNE Directors and the SUNE Underwriters

143.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

144.    This cause of action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, for damages in connection with SUNE's August 18, 2015 offering of SUNE Preferred Stock.

145.    This cause of action is a strict liability claim and does not sound in fraud. Plaintiffs do not allege that defendants acted with scienter or fraudulent intent as they are not elements of a §11 claim.

146.    Plaintiffs purchased SUNE Preferred Stock traceable to the SUNE Preferred Offering Materials.

147.    This cause of action is brought against defendants SUNE, Chatila, Wuebbels, Truong, the SUNE Directors and the SUNE Underwriters. Each of the following defendants is liable to Plaintiffs as:

- SUNE is the registrant and the issuer of the SUNE Preferred Stock for the SUNE Preferred Offering. As the issuer of the SUNE Preferred Stock, SUNE is strictly liable for any material misstatements or omissions in the SUNE Preferred Offering Materials.

- Chatila, Wuebbels and Truong were officers of SUNE at the time of the SUNE Preferred Offering and were responsible for the contents of and signed the SUNE Preferred Offering Materials.

- Each of the SUNE Directors was a director of SUNE at the time of the filing of the SUNE Preferred Offering Materials (except for Proctor and Daley, who were directors only at the time of the filing of the Preferred Offering Prospectus), and each was responsible for the contents of and each (except for Proctor and Daley) signed the SUNE Preferred Offering Materials.

- Each of the SUNE Underwriters served as an underwriter with respect to the SUNE Preferred Stock sold in the SUNE Preferred Offering and was responsible for the contents of the SUNE Preferred Offering Materials.

- 37 -

148.   The SUNE Preferred Offering Materials contained untrue statements of material fact and/or omitted to state other material facts that were necessary to prevent the statements contained therein from being misleading or that were otherwise required to be stated therein, as set forth below.

149.   None of the defendants named in this cause of action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SUNE Preferred Offering Materials that are alleged below were true and did not omit to state material facts that were otherwise required to be stated therein or were necessary to prevent the other statements contained therein from being misleading.

150.   The SUNE Preferred Offering Materials incorporated by reference the quarterly, annual, and current reports SUNE had filed with the SEC prior to the SUNE Preferred Offering, including SUNE's 2Q15 Report on Form 10-Q (filed on August 6, 2015) and its 1Q15 Report on Form 10-Q (filed on May 7, 2015). Both Form 10-Q reports were signed by Wuebbels and included certifications pursuant to the Sarbanes-Oxley Act of 2002 that were signed by Chatila and Wuebbels.

151.   At the time they acquired their shares of SUNE Preferred Stock in the SUNE Preferred Offering, Plaintiffs were without knowledge of the untruths and omissions set forth below.

152.   This claim is timely, as it has been asserted within one year after the discovery of the untrue statements and omissions alleged herein, or after such discovery could have been made in the exercise of reasonable diligence, and within three years of the SUNE Preferred Offering.

153.   By reason of the conduct herein alleged, each of the defendants named in this cause of action violated §11 of the 1933 Act.

154.   As a result of the violations of §11 complained of herein, Plaintiffs have sustained damages in connection with their purchases of SUNE Preferred Stock. Prior to suit, Plaintiffs disposed of their shares of SUNE Preferred Stock at prices that were substantially below the amounts they paid for those securities.

**Untrue Statements of Material Fact in and Other Material Facts Omitted from the SUNE Preferred Offering Materials**

155.   The SUNE Preferred Offering Materials contained untrue statements of material fact and/or omitted to state other material facts necessary to make the statements made therein not

- 38 -

1 misleading, relating to SUNE's liquidity and its ability to fund the company's current operations and

2 near-term growth, including that:

3         (a)     SUNE had borrowed $169 million from Goldman on August 11, 2015 at a rate of

4 9.25% and paid a $9 million origination fee (5.3%) to do so;

5         (b)     SUNE had breached the debt covenants in the Margin Loan, which required

6 SUNE to post additional cash collateral of at least $159 million to avoid default on the loan, and was at

7 risk of further breaches if the price of TERP common stock did not immediately rebound (collectively,

8 the "Margin Loan Breach"); and

9         (c)     SUNE's existing sources of liquidity were insufficient to fund its business

10 operations over the next 12 months or complete the acquisitions it planned for the GLBL start-up

11 portfolio (the "Current Liquidity Shortfall").

12      156.    Disclosure of the 15% Goldman Loan or the Margin Loan Breach would have revealed

13 to investors that SUNE's borrowing strength, financial condition and liquidity had deteriorated and,

14 therefore, that SUNE had an existing liquidity shortfall.

15      157.    The facts detailed in ¶155, were also required to be disclosed, *inter alia*, because the

16 rules and regulations governing registration statements required the registrants to disclose any material

17 trends in the registrant's liquidity and capital resources.

18     **A.**    **Liquidity, Capital Resources and Descriptions of Borrowing Agreements**

19      158.    SUNE's 2Q15 Report on Form 10-Q, which was incorporated by reference into the

20 SUNE Preferred Offering Materials, purported to describe, at pages 60-66, the company's liquidity and

21 capital resources by describing its existing borrowings (including the Margin Loan) and other sources of

22 capital, and its anticipated uses of that capital and future needs for additional capital. For example, the

23 2Q15 Report on Form 10-Q stated:

24         Our consolidated financial statements have been prepared assuming the
realization of assets and the satisfaction of liabilities in the normal course, as well as

25         continued compliance with the financial and other covenants contained in our existing
credit facilities and other financing arrangements.

26

                      \*       \*       \*

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

In addition to our need to maintain sufficient liquidity from cash flow from our operations and borrowing capacity under our credit facilities, we will need to raise additional funds in the future in order to meet the operating and capital needs of our renewable energy system development business, including the acquisition and construction of renewable energy systems that we intend to retain on our balance sheet, including those systems that we intend to contribute to TerraForm Power and TerraForm Global. These funds are expected to be in the form of non-recourse project finance capital. However, there can be no assurances that such project financing or equity will be available to us, or available at terms and conditions we find acceptable. We may not be able to sell renewable energy projects or secure adequate debt financing or equity funding for such projects on favorable terms, or at all, at the time when we need such funding.

In the event that we are unable to raise additional funds, our liquidity will be adversely impacted, we may not be able to maintain compliance with our existing debt covenants and our business will suffer. If we are able to secure additional financing, these funds could be costly to secure and maintain and could significantly impact our earnings and our liquidity.

We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

159.   The statements made in ¶158 above contained untrue statements of material fact and/or omitted to state other material facts necessary to make the statements made therein not misleading, including the 15% Goldman Loan, the Margin Loan Breach and the Current Liquidity Shortfall, as well as:

(a)   purporting to warn investors that SUNE's liquidity and financial position "could be" harmed if SUNE had to raise additional funds or could not obtain financing on favorable terms, while failing to disclose that – prior to the SUNE Preferred Offering – SUNE had borrowed $169 million from Goldman at an effective interest rate of 15% to generate badly needed operating cash and complete the acquisition of projects for GLBL's start-up portfolio; and

(b)   stating that SUNE's financial statements had been prepared "assuming . . . continued compliance with the financial and other covenants in our existing credit facilities and other financing arrangements," and that based on those financial statements, SUNE and the SUNE Directors believed that "our liquidity will be sufficient to support our operations for the next twelve months,"

- 40 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

without disclosing that – as of August 18, 2015 (date of the SUNE Preferred Offering) – SUNE had breached the covenants on the Margin Loan (and would need to post $159 million in additional cash collateral on the loan) or that TERP's stock price was dangerously close to the level that would trigger a breach of the Margin Loan debt covenants.

160.    Plaintiffs and other investors would not have purchased the SUNE Preferred Stock had they known that SUNE had recently borrowed funds at an effective rate of 15% from one of the underwriters.

161.    The 2Q15 Report on Form 10-Q also provided a false and misleading description of the Margin Loan's debt covenants:

> The Margin Loan Agreement requires the subsidiary to maintain a loan to value ratio not to exceed 50% (based on the value of the Class A common stock of TerraForm ("TerraForm Class A Common Stock"), which certain of the collateral may be exchanged for). In the event that this ratio is not maintained, the subsidiary must post additional cash collateral under the Margin Loan Agreement and/or elect to repay a portion of the term loans thereunder. In addition, the Margin Loan Agreement requires the repayment of all or a portion of the term loans made thereunder upon the occurrence of certain events customary for financings of this nature, including other events relating to the price, liquidity or value of TerraForm Class A Common Stock, certain events or extraordinary transactions related to TerraForm and certain events related to SunEdison.

> The Borrower's obligations under the Margin Loan Agreement are secured by a first priority lien on shares of Class B common stock in TerraForm, and Class B units and incentive distribution rights in Terra LLC, in each case, that are owned by the subsidiary. The Margin Loan Agreement contains customary representations and warranties, covenants and events of default for financings of this nature. Upon the occurrence and during the continuance of an event of default, any lender may declare the term loans due and payable, exercise remedies with respect to the collateral and demand payment from SunEdison of the obligations under the Margin Loan Agreement then due and payable. TerraForm has agreed to certain obligations in connection with the Margin Loan Agreement relating to its equity securities.

162.    The foregoing statements contained untrue statements of material fact and/or omitted to disclose the Margin Loan Breach, and in the absence of that disclosure, it was false and/or misleading to:

(a)    describe the triggers for debt covenant violations under the loan without disclosing that the triggers had been, or were about to be, breached;

(b)    warn of the consequences that *could* result from a breach of the debt covenants without disclosing that SUNE was already liable for posting an additional $159 million in cash collateral on the loan; and

1         (c)     fail to warn that the failure of TERP's stock price to improve from current levels

2 or that a further decline in its value would trigger a further breach of those covenants.

3        163.     The Preferred Offering Prospectus also included a description of lending agreements

4 between SUNE and the SUNE Underwriters, which stated:

5           Certain of the underwriters and their respective affiliates have provided, from
time to time in the past, and may in the future provide, investment banking, financial
6     and other services to us. They receive customary fees and commissions for these
services. The underwriters and their respective affiliates are full service financial
7     institutions engaged in various activities, which may include sales and trading,
commercial and investment banking, advisory, investment management, investment
8     research, principal investment, hedging, market making, brokerage, tax equity financing
and other financial and nonfinancial activities and services. Certain of the underwriters
9     and their affiliates have provided, and may in the future provide, a variety of these
services to us and to persons and entities with relationships with us, for which they
10    received or will receive customary fees and expenses.

11           In addition, certain of the underwriters or their respective affiliates are parties to
the bridge financing commitments entered into in connection with the First Wind
12     Acquisition and lenders under the $410 million margin loan secured by a portion of our
equity stake in TerraForm that we incurred on January 29, 2015. Also, certain of the
13     underwriters or their respective affiliates are parties to the senior secured letter of credit
facility with us in an aggregate principal amount up to $750 million as of July 31, 2015.
14     We have also entered into a commitment letter with Goldman Sachs Bank USA for a
$500 million secured term loan facility, and TerraForm Operating has entered into a
15     debt commitment letter with Goldman Sachs Bank USA for a $960 million unsecured
bridge facility pursuant to which certain of the underwriters or their affiliates will be
16     lenders. The funding of the term facility and bridge facility is subject to the negotiation
of definitive documentation and other customary closing conditions. We have also
17     entered into a $150 million four-year term loan with Deutsche Bank in connection with
our joint venture with Dominion for Four Brothers. In addition, certain investment funds
18     managed by Goldman, Sachs & Co. (collectively, the "GS Funds") have entered into
agreements with us to form a new warehouse for the construction and acquisition of
19     utility-scale solar and wind projects (the "Warehouse"). Subject to certain conditions,
the GS Funds have agreed to contribute up to $300 million of equity to the Warehouse,
20     and a syndicate of banks, including certain of the underwriters or their respective
affiliates, have agreed to provide debt financing to the Warehouse of up to $700 million
21    in senior secured credit facilities.

22        164.     The foregoing statements were materially false and misleading as they purported on their

23 face to be a complete disclosure of the borrowing agreements between SUNE and its underwriters, yet

24 omitted to disclose the 15% Goldman Loan and that SUNE was liable to certain of the SUNE

25 Underwriters, including Goldman and Deutsche Bank, to post additional cash collateral on the Margin

26 Loan because the value of the TERP equity stake described therein had insufficient value to maintain

27 compliance with the applicable debt covenants.

28    **B.**    **Results of Operations and Recent Developments**

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

165.    The SUNE Preferred Offering Materials, including SUNE's 2Q15 Report on Form 10-Q incorporated therein, violated, *inter alia*, the rules and regulations governing registration statements, because the discussions and analysis of SUNE's financial condition, results of operations and recent developments all failed to disclose the 15% Goldman Loan, the Margin Loan Breach, and the Current Liquidity Shortfall, each of which represented, both individually and cumulatively, material trends in SUNE's liquidity and capital resources.

166.    The Preferred Offering Prospectus's discussion of Recent Developments at pages S-2 to S-6 was also false and misleading as it described: (i) SUNE's warehouse financing facility; (ii) joint venture agreement with Dominion Resources; (iii) the GLBL IPO; and (iv) the merger and acquisition agreements with VSLR, Renova and Invenergy – while omitting to disclose the 15% Goldman Loan, the Margin Loan Breach or the Current Liquidity Shortfall.

167.    SUNE's 2Q15 Report on Form 10-Q, which was incorporated by reference into the Preferred Offering Prospectus, discussed Recent Developments of SUNE while omitting to disclose the 15% Goldman Loan, the Margin Loan Breach or the Current Liquidity Shortfall, and was therefore materially false and misleading for the same reason.

168.    SUNE's 2Q15 Report on Form 10-Q also provided at page 52 the following overview of the company's business:

> During the second quarter of 2015, we continued execution of a strategic plan for the ongoing operation of our businesses. Our business strategy is designed to address the most significant opportunities and risks which we currently face, including:
>
> • Building our renewable energy project pipeline in order to fuel future global growth in our development business across all platforms.
>
> • Growing our portfolio of owned renewable power generation assets within TerraForm and other future vehicles in order to generate cash available for distribution, a portion of which will subsequently be distributed to common shareholders of TerraForm, as well as, in the future, preferential sponsor only incentive distributions rights to SunEdison.
>
> • Managing working capital in consideration of our growth initiatives as well as our desire to retain the majority of the renewable energy projects we develop on our balance sheet (through TerraForm or other future vehicles).

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    169.   The foregoing statements in ¶¶167-168 were materially false and misleading because, in

2    failing to disclose the 15% Goldman Loan, the Margin Loan Breach or the Current Liquidity Shortfall,

3    the 2Q15 Report on Form 10-Q omitted "significant . . . risks which we currently face," including:

4                  (a)     that SUNE lacked adequate liquidity to build its "renewable energy project

5    pipeline in order to fuel future global growth";

6                  (b)     significant current events such as the 15% Goldman Loan and the Current

7    Liquidity Shortfall that severely undermined SUNE's business strategy to "[g]row[] our portfolio of

8    owned renewable power generation assets" within GLBL and TERP to generate sufficient CAFD

9    growth to make required DPS payments and meet milestones that would permit the payment of IDRs to

10   SUNE; and

11                 (c)     a material weakness in SUNE's ability to manage its working capital in a manner

12   that would permit it to meet its growth initiatives and retain the majority of its renewable energy

13   projects on its balance sheet.

14   **C.     Use of Proceeds**

15   170.   The Preferred Offering Prospectus stated the following under the heading "Use of

16   Proceeds":

17              We estimate that the proceeds from this offering, after deducting the
             underwriters' discounts and commissions and estimated offering expenses payable by
18           us, will total approximately $626.1 million.

19              We expect to use the net proceeds of this offering for general corporate
             purposes, which we expect to include funding working capital and growth initiatives. At
20           this time, we have not specifically identified a large single use for which we intend to
             use the net proceeds, and, accordingly, we are not able to allocate the net proceeds
21           among any potential uses in light of the variety of factors that will impact how such net
             proceeds will ultimately be utilized by us. As a result, our management will retain broad
22           discretion over the use of the net proceeds from this offering.

23              Pending use of the proceeds from this offering, we intend to invest the proceeds
             in short-term, investment-grade and interest-bearing instruments or money market
24           funds.

25   171.   The foregoing statements in ¶170 were materially false and misleading because the true

26   purpose of the SUNE Preferred Offering was to address the *current* liquidity shortfall that had

27   manifested in a liquidity crisis at SUNE. Together with the other representations made in connection

28   with the SUNE Preferred Offering as described in ¶¶158-169 above, the foregoing language created the

1   misleading impression that SUNE was raising capital to preserve its flexibility to take advantage of
2   future opportunities as they arose, and not to meet existing liabilities and immediate needs, which was
3   the true purpose of the SUNE Preferred Offering.

4   **SECOND CAUSE OF ACTION**

5   **For Violation of §12(a)(2) of the 1933 Act in Connection
with the SUNE Preferred Offering Against SUNE, Chatila,**
6   **Wuebbels, Alex Hernandez, the SUNE Directors and the SUNE Underwriters**

7       172.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

8       173.    This cause of action is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C.
9   §77l(a)(2), for damages against defendants SUNE, Chatila, Wuebbels, Alex Hernandez, the SUNE
10  Directors and the SUNE Underwriters.

11      174.    This cause of action does not sound in fraud. Plaintiffs do not allege that defendants had
12  scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

13      175.    The defendants named in this cause of action offered to sell, promoted and/or sold SUNE
14  Preferred Stock to the Plaintiffs by means of the Preferred Offering Prospectus and oral
15  communications that included untrue statements of material fact and omitted to state other material facts
16  necessary in order to make the statements made therein, in light of the circumstances under which they
17  were made, not misleading, as alleged below and in ¶¶155-171 above.

18      176.    The defendants named in this cause of action were statutory sellers who solicited the sale
19  of and/or sold the SUNE Preferred Stock by means of the Preferred Offering Prospectus and oral
20  communications, and they did so for the benefit of SUNE and/or for their own personal gain.

21      177.    Plaintiffs purchased SUNE Preferred Stock in the SUNE Preferred Offering pursuant to
22  the Preferred Offering Prospectus. Plaintiffs purchased SUNE Preferred Stock from Goldman.

23      178.    On August 17, 2015, Plaintiffs confirmed that they would participate in the SUNE
24  Preferred Offering.

25      179.    At no time during the August 2015 communications did any participant correct or
26  modify any misleading statements defendants had made on the 2Q15 earnings call about SUNE's

27

28

1  liquidity, including those alleged above in ¶¶103-105, nor did any participant disclose the 15%

2  Goldman Loan or the Margin Loan Breach.

3    180.    None of the defendants named in this cause of action made a reasonable investigation or

4  possessed reasonable grounds for the belief that the statements contained in the Preferred Offering

5  Prospectus and the oral communications detailed herein, were true and did not omit to state material

6  facts necessary to be stated in order to make the statements made therein not false or misleading. The

7  defendants named herein, in the exercise of reasonable care, should have known of the misstatements

8  and omissions as set forth above.

9    181.    At the time they acquired their shares of SUNE Preferred Stock, Plaintiffs did not know,

10  nor in the exercise of reasonable diligence could they have known, of the untruths and omissions

11  alleged in this cause of action.

12    182.    This cause of action is timely, as it has been asserted within one year after the discovery

13  of the untrue statements and omissions alleged herein, or after such discovery could have been made in

14  the exercise of reasonable diligence, and within three years of the SUNE Preferred Offering.

15    183.    By reason of the conduct alleged herein, the defendants named in this cause of action

16  violated §12(a)(2) of the 1933 Act.

17    184.    Plaintiffs sustained damages in connection with their purchases of SUNE Preferred

18  Stock as a direct and proximate result of defendants' violations of §12(a)(2) of the 1933 Act. Plaintiffs

19  seek damages to the extent permitted by law.

## THIRD CAUSE OF ACTION

### For Violation of §15 of the 1933 Act in Connection with the SUNE Preferred Offering Against Chatila, Wuebbels and Truong

185.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

186.    This cause of action is brought pursuant to §15 of the 1933 Act against defendants

Chatila, Wuebbels and Truong.

187.    Chatila, Wuebbels and Truong controlled SUNE by virtue of their senior positions with

the company and their power to set, influence and enforce the financial, operating and disclosure

policies and procedures of the business, including those detailed in ¶¶12, 13, 15 147 above.

- 46 -

188.    Chatila, Wuebbels and Truong each had additional control over SUNE as a result of their direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of SUNE.

189.    Defendants each were participants in the violations of §§11 and/or 12(a)(2) of the 1933 Act as alleged above, based on their having signed or authorized the signing of the SUNE Preferred Offering Materials and having otherwise actively participated in the sales process, including the preparation of the selling documents and/or road show presentations which allowed the SUNE Preferred Offering to be successfully completed.

## FOURTH CAUSE OF ACTION

**For Violation of §12(a)(2) of the 1933 Act
in Connection with the GLBL Bond Offering Against
SUNE, GLBL, the Individual Defendants and the GLBL Bond Underwriters**

190.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

191.    This claim is brought pursuant to §12(a)(2) of the 1933 Act, against defendants SUNE, GLBL, the Individual Defendants and the GLBL Bond Underwriters.

192.    This claim does not sound in fraud. Plaintiffs do not allege that defendants acted with scienter or fraudulent intent, as they are not elements of a §12(a)(2) claim.

193.    The defendants named in this cause of action were statutory sellers who sold and assisted in the sale of the GLBL Bonds to Plaintiffs and others by means of the GLBL Bond Offering Materials and did so for the benefit of SUNE, GLBL, and their own personal gain.

194.    Plaintiffs purchased the GLBL Bonds in the GLBL Bond Offering and did so from defendant JP Morgan.

195.    The defendants named in this cause of action solicited the sale of and sold the GLBL Bonds by means of the GLBL Bond Offering Materials, which included untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made therein not false or misleading, as set forth below.

- 47 -

196.   None of the defendants named in this cause of action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the GLBL Bond Offering Materials and the oral communications detailed herein were true and did not omit to state a material fact necessary to be stated in order to make the statements made therein not false or misleading. The defendants named herein, in the exercise of reasonable care, should have known of the misstatements and omissions as set forth above.

197.   At the time Plaintiffs acquired the GLBL Bonds, they did not know, nor in the exercise of reasonable diligence could they have known, of the untruths and omissions contained in the GLBL Bond Offering Materials.

198.   The GLBL Bond Offering was a public offering, as indicated by, *inter alia*, the size of the offering – approximately $800 million – as well as the worldwide nature of the offering with road shows conducted from London to Hong Kong to New York to Boston to San Francisco and Los Angeles, soliciting purchases by both qualified and non-qualified investors, all conducted by high-profile investment banks. So too, the GLBL Bond Offering coincided and was integrated with the GLBL IPO.

199.   This claim is timely, as it has been asserted within one year after the discovery of the untrue statements and omissions alleged herein, or after such discovery could have been made in the exercise of reasonable diligence, and within three years of the GLBL Bond Offering.

200.   Plaintiffs have the right to rescind and recover the consideration paid for their GLBL Bonds. Plaintiffs hereby tender their GLBL Bonds to the defendants sued herein and to the extent Plaintiffs sold any GLBL Bonds they seek damages to the extent permitted by law.

201.   By reason of the conduct alleged herein, the defendants named in this cause of action violated §12(a)(2) of the 1933 Act.

202.   As a direct and proximate result of such violations, Plaintiffs sustained damages in connection with their purchases of GLBL Bonds.

**Untrue Statements of Material Fact in and Other Material**
**Facts Omitted from the GLBL Bond Offering Materials**

**A.     SUNE's Inability to Finance GLBL's High Growth Strategy**

203.    The GLBL Bond Offering Memorandum emphasized the strength of GLBL and its relationship with SUNE. GLBL described itself as a "high-growth" company that could reasonably be expected to grow its MWs under management and achieve a 20% CAGR through the continuous acquisition of projects developed by SUNE for its portfolio. The Overview of the business provided in the GLBL Bond Offering Memorandum began as follows:

> We are a high-growth, globally diversified renewable energy company that owns long-term contracted wind, solar and hydro-electric power plants. Our business objective is to increase our dividend to stockholders by continuing to acquire, from SunEdison and unaffiliated third parties, clean power generation assets that produce high-quality, long-term contracted cash flows, primarily by serving utility and commercial customers with strong credit profiles.

GLBL Bond Offering Memorandum at 1, 122, 169.

204.    The GLBL Bond Offering Memorandum asserted that GLBL would "rapidly expand" its project portfolio by exercising its ROFO rights to acquire and operate the projects on the call list from SUNE:

> *Call and ROFO rights*
>
> We believe we will be able to rapidly expand our initial portfolio as a result of the significant project acquisition call rights and rights of first offer, or "ROFO rights," that we have with our Sponsor and the project acquisition call rights and ROFO rights we have and expect to acquire from third-party developers of clean power generation assets. Upon completion of the IPO, we will have call rights with respect to identified projects that have an aggregate capacity of 5,856.1 MW.
>
> We will enter into a support agreement with our Sponsor immediately prior to the completion of the IPO, pursuant to which our Sponsor will agree to offer us additional qualifying projects through the fifth anniversary of the completion of the IPO that are projected to generate an aggregate of at least $1.4 billion of cash available for distribution during their respective first twelve months of commercial operations. We expect that our Sponsor will continue to provide us with the opportunity to acquire additional qualifying projects after it has satisfied its minimum commitment under the support agreement in order to maximize the value of its equity ownership and incentive distribution rights. The support agreement with our Sponsor will also grant us ROFO rights with respect to additional clean energy projects that our Sponsor elects to sell or otherwise transfer and that are located in our initial target markets or other emerging markets that we mutually agreed upon.

GLBL Bond Offering Memorandum at 2, 169; *see also id.* at 14, 173 ("[W]e will be able to rapidly expand our initial portfolio through several channels. We have significant project acquisition call rights

- 49 -

1  and ROFO rights with our Sponsor."); *id.* at 59 ("We intend to rapidly expand and diversify our initial

2  portfolio by acquiring additional utility-scale and distributed clean generation assets . . . ."); *id.* at 122,

3  175 ("We intend to rapidly expand and diversify our initial portfolio . . . .").

4       205.   The GLBL Bond Offering Materials also represented that SUNE's financial strength,

5  liquidity, access to capital markets, and project acquisition and financing experience were what would

6  allow GLBL to attain these targets and meet its high-growth business objectives.  For example, the

7  GLBL Bond Offering Memorandum at page 2 emphasized SUNE's financial strength and track record,

8  stating:

9       We believe we are well positioned to capitalize on favorable market trends in the
   renewable power generation segment due to our relationship with our Sponsor, which
10  has an established presence in each of our initial target markets, a strong asset
   development pipeline and acquisition track record, significant project financing
11  experience and asset management and operational expertise.

12       206.   The GLBL Bond Offering Memorandum repeatedly emphasized the strength of SUNE's

13  business, GLBL's relationship with SUNE and the resultant benefits that relationship would have for

14  GLBL, including GLBL's "access to the significant resources of our Sponsor to support the high-

15  growth strategy of our business."  The GLBL Bond Offering Memorandum further stated:

16       ***Relationship with SunEdison****. We believe our relationship with our Sponsor provides
   us with significant benefits, including the following:

17

18      •  *Strong asset development track record.* Our Sponsor has demonstrated a
   significant track record in developing both solar and, as a result of its acquisition
19  of First Wind, wind energy generation facilities. Over the last three calendar
   years, our Sponsor has constructed solar power generation assets with an
20  aggregate capacity of 2.0 GW and, as of March 31, 2015, was constructing
   additional solar power generation assets expected to have an aggregate capacity
21  of approximately 773.7 MW. Our Sponsor has been one of the top three
   developers and installers of solar energy facilities in the world in each of the
22  past two years based on megawatts installed. Our Sponsor has developed over
   1,300 solar and wind projects and has completed all of the projects on which it
23  has commenced construction, including over 140 projects in our initial target
   markets. In addition, our Sponsor had a 7.5 GW pipeline of development stage
24  solar and wind projects as of March 31, 2015, including 1.7 GW in our initial
   and future target markets. As of the same date, our Sponsor employed 3,400
25  people globally, of which over 1,900 were serving as developers and operators
   of renewable energy projects. Our Sponsor's operating history demonstrates its
26  organic project development capabilities in our initial target markets. We believe
   our Sponsor's relationships, knowledge and employees will facilitate our ability
27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

to rapidly acquire operating projects from our Sponsor in our initial target markets.

- *Yieldco experience.* Our Sponsor's subsidiary, TerraForm Power, which owns and operates clean power assets located in the United States and other select jurisdictions, completed its initial public offering in July 2014. With our Sponsor's support, TerraForm Power has raised approximately $3.9 billion in acquisition and permanent financing to pursue acquisitions of renewable energy projects totaling 1,703.0 MW as of May 1, 2015.

- *Proven acquisition expertise.* In 2014, our Sponsor completed 32 corporate and project acquisitions worldwide, which included operating projects with an aggregate nameplate capacity of 1.5 GW. In addition, our Sponsor, through TerraForm Power, completed the acquisition on January 29, 2015 of First Wind's 500.0 MW of operating wind generation assets and 21.1 MW of operating solar generation assets and 1.66 GW of wind and solar generation assets under development. These acquisitions include two wholly owned subsidiaries of Honiton, which provides our Sponsor with an operating and maintenance platform in China. Additionally, our Sponsor's pending acquisition of LAP will provide it with a hydro-electric development pipeline in Peru and an operations and maintenance platform in Latin America. We believe our Sponsor's significant acquisition experience and expertise will enable us to expand our portfolio through additional acquisitions of operating projects from unaffiliated third parties in our initial target markets. Our initial portfolio includes two projects that we have acquired from third parties. Concurrently with the IPO and this offering or, in certain cases, during the remainder of 2015, we expect to complete seven separate transactions to acquire projects included in our initial portfolio, expanding our geographic footprint and diversifying our renewable energy technologies.

- *Project financing experience.* We believe our Sponsor has demonstrated a successful track record of sourcing long-term capital to fund project acquisitions and the development and construction of projects located in our initial target markets. To date, our Sponsor has raised an aggregate of $3.3 billion since January 1, 2014 to support its development and acquisition activities. We expect that we will realize significant benefits from our Sponsor's financing and structuring expertise as well as its relationships with financial institutions and other providers of capital.

- *Asset management expertise.* We will have access to the significant resources of our Sponsor to support the high-growth strategy of our business. As of March 31, 2015, our Sponsor had over 4.9 GW of projects under management across 20 countries. Approximately 16.1% of these projects are third-party power generation facilities, demonstrating our Sponsor's collaboration with multiple developers and owners. These projects utilize 29 different module types and inverters from 17 different manufacturers. As of March 31, 2015, our Sponsor had approximately 700 employees servicing operations and management in our initial target markets. In addition, our Sponsor maintains three renewable energy

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

operation centers to service assets under management. Our Sponsor's asset management experience helps ensure that our facilities will be monitored and maintained to maximize cash generation. We also benefit from First Wind's asset management expertise as the First Wind team has been integrated with our Sponsor.

GLBL Bond Offering Memorandum at 15-16, 173-74.

207.   The statements made in ¶¶203-206, contained untrue statements of material fact and/or omitted to state other material facts necessary to make the statements made therein not misleading, including that:

(a)   GLBL was not positioned to benefit from SUNE's "significant resources" in light of the undisclosed fact that SUNE had insufficient liquidity to support the "high-growth strategy" or permit the "rapid[] expan[sion]" of the business via the call rights list;

(b)   SUNE lacked sufficient liquidity and access to capital to acquire or develop the projects in the manner or within the timeframes represented;

(c)   the foregoing statements concerning SUNE's liquidity and capital markets expertise were misleading, as they omitted to disclose that: (i) SUNE had structured the 15% Goldman Loan to acquire projects for GLBL's start-up portfolio and/or cure an actual or anticipated debt covenant breach, (ii) SUNE was then in breach of the debt covenants under the Margin Loan, or such a breach was imminent, and (iii) the vast majority of the liquidity that SUNE had was unavailable to be used for working capital, leaving it with insufficient cash to meet the day-to-day needs of its business;

(d)   as a result of (a)-(c) above, and in light of SUNE's other existing financial obligations and commitments as alleged herein, there was no reasonable basis to believe that SUNE would have sufficient liquidity to acquire, develop and construct the projects on GLBL's call rights list that needed to be dropped down in order to permit GLBL to realize its forecast MW growth, or to do so at a cost that would permit GLBL to meet its CAFD or DPS growth forecasts;

(e)   GLBL was not positioned to benefit from its relationship with SUNE in the manner represented, as SUNE lacked the ability to acquire the LAP, Renova, Continuum and other projects on GLBL's call rights list or to carry out its obligations under the Support Agreement to offer

1  or provide GLBL, within five years of the IPO, projects that would generate an aggregate of $1.4 billion

2  in CAFD during their first year of operation;

3          (f)     SUNE lacked the liquidity and financial strength to permit GLBL to have a

4  reasonable expectation of meeting the stated growth targets of 20% CAGR in dividends for its business;

5          (g)    as a result of (a)-(f) above, the defendants named in this cause of action were

6  aware of facts that conflicted with what a reasonable investor would take from defendants' statements

7  in ¶¶203-206 above, and had no reasonable basis for GLBL's MW, CAFD or dividend growth forecasts

8  or the representations about SUNE's financial strength or GLBL's ability to benefit from its relationship

9  with SUNE, given SUNE's lack of liquidity at the time of the offering; and

10          (h)    as a result of (a)-(f) above, the foregoing statements were at best misleading

11  "half-truths" that failed to disclose or understated the risks and overstated GLBL's ability to rapidly

12  expand its business in a manner that would permit it to realize the high growth objectives described in

13  the GLBL Bond Offering Materials.

14      208.    The GLBL Bond Offering Materials were also materially false and misleading as

15  described below because they omitted, in violation of the rules and regulations governing registration

16  statements, to disclose material trends in SUNE's liquidity and capital resources and, therefore, the

17  liquidity and capital resources that would be available to GLBL.

18      209.    The GLBL Bond Offering Memorandum, at page 14, stated that GLBL's financial

19  practices (which were wholly dependent upon and operated by SUNE under the Management Services

20  Agreement) included "*financing policy focused on achieving an optimal capital structure through*

21  *various capital formation alternatives to minimize interest rates, refinancing risks and tax*

22  *withholdings*." This statement was materially false and misleading in that it failed to disclose that

23  SUNE had already violated that policy by structuring an agreement to borrow funds from Goldman at

24  an exorbitant interest rate (the 15% Goldman Loan) and had breached or was about to breach another

25  agreement (the Margin Loan) in a manner that gave rise to a significant risk that the agreement would

26  have to be (and ultimately was) refinanced.

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

**B.    Misleading Risk Warnings**

210.    The GLBL Bond Offering Materials also misled investors by warning of conditions that might harm GLBL's business *if* they arose in the future, when, in fact, those conditions had already manifested, resulting in current conditions then impacting GLBL at the time of the offering, as opposed to the contingent future risks that the GLBL Bond Offering Materials represented.

211.    For example, the GLBL Bond Offering Memorandum stated:

> Any significant disruption in the credit or capital markets, or a significant increase in interest rates, could make it difficult for our Sponsor or other development companies to successfully develop attractive projects and may also limit their ability to obtain project-level financing to complete the construction of projects we may seek to acquire. It could also adversely affect our ability to fund acquisitions and/or operating costs. If our Sponsor or other development companies from which we seek to acquire projects are unable to raise funds when needed, or if we or they are unable to secure adequate financing, the ability to grow our project portfolio may be limited, which could have a material adverse effect on our ability to implement our growth strategy and, ultimately, our business, financial condition, results of operations and cash flows.

GLBL Bond Offering Memorandum at 45-46.

212.    The foregoing "risk disclosure" in the GLBL Bond Offering Memorandum was materially false and misleading.  The true facts were that SUNE's borrowing costs had already increased dramatically, as evidenced by the undisclosed 15% Goldman Loan SUNE had structured. Thus, at the time of the offering, SUNE already lacked the ability to successfully develop projects with project-level financing that permitted it to complete the construction of such projects on terms and at a cost that would permit SUNE to implement its growth strategy without adversely affecting its business, financial conditions, results of operations and cash flows.  Likewise, the failure to disclose the actual or imminent breach of the Margin Loan confirms that the risks described in the GLBL Bond Offering Memorandum as contingent future events had in fact already manifested as of July 31, 2015.

213.    In the GLBL Bond Offering Memorandum, defendants "forecast that our cash available for distribution during the twelve months ending June 30, 2016 and December 31, 2016 will be approximately $195.8 million and $231.5 million, respectively, of which we forecast $101.9 will be distributed" as dividends, and that this would be sufficient to pay SUNE's annual dividend of $1.10. The GLBL Bond Offering Memorandum further asserted that: (i) GLBL "ha[d] a reasonable basis for these assumptions and that our actual results of operations will approximate those reflected in our

- 54 -

1  forecast"; (ii) "[f]or purposes of our forecast, we have assumed that no unexpected risks will materialize

2  during the forecast periods"; and (iii) based on GLBL's ability to expand its project portfolio through

3  the projects on the SUNE call rights list, GLBL could reasonably be expected to achieve a 20% CAGR

4  in the dividends paid to investors over the first three years of its life. The GLBL Bond Offering

5  Memorandum also stated:

6           We intend to target a 20% CAGR in dividends per share over the three-year
          period following the completion of the IPO. This target is based on, and supported by,
7          our Sponsor's $1.4 billion aggregate Projected FTM CAFD commitment to us under the
          Support Agreement and our Sponsor's track record of successful project acquisitions
8          from unaffiliated third parties, which will provide us the opportunity to grow our CAFD
          following the IPO and this offering. While we believe our targeted growth rate is
9          reasonable for the emerging markets on which we focus, it is based on estimates and
          assumptions regarding a number of factors, many of which are beyond our control,
10         including the market value of projects we acquire from third parties, the purchase price
          we pay for acquired projects, our cost of capital, the ratio of debt to equity with respect
11         to the financing of acquisitions, whether we have the financial resources to acquire the
          Call Right Projects and the timing of such acquisitions. Prospective investors should
12         read "Cash dividend policy," including our financial forecast and related assumptions,
          and "Risk factors," including the risks and uncertainties related to our forecasted results,
13         completion of construction of projects and acquisition opportunities, in their entirety.

14  GLBL Bond Offering Memorandum at 5.

15         214.   The foregoing statements were materially misleading because there was no reasonable

16  basis for the assumption that the projects on GLBL's call rights list could be acquired on terms that

17  would support forecast CAFD or DPS growth, or at all in light of SUNE's deteriorating liquidity

18  condition. Neither was it reasonable to prepare forecasts based on an expectation that no unexpected

19  risks would materialize. By the time of the offering, undisclosed conditions had already materialized

20  that threatened the ability to acquire or complete the projects on GLBL's call rights list or achieve its

21  long-term growth forecasts. SUNE had also already structured the 15% Goldman Loan to acquire

22  projects for its start-up list, the debt covenants on the Margin Loan were dangerously close to the level

23  that would cause them to be breached (or a breach had already occurred), and SUNE lacked the

24  liquidity to acquire and develop some of the projects on GLBL's call rights list, including projects from

25  LAP, Continuum, Globeleq and Renova.

26         215.   The GLBL Bond Offering Memorandum at pages 7-8 included descriptions of GLBL's

27  initial project portfolio and the projects on its call rights list with SUNE, stating that by the end of 2015,

28  GLBL's initial project portfolio would consist of 1,406 MW of capacity. The GLBL Bond Offering

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    Memorandum also included at page 8 a "risk disclosure" noting that some of those acquisitions could be

2    delayed if the transactions did not receive government approval or if construction was not completed so

3    that the plants were placed into commercial operation by the end of the year, stating:

4             With the exception of five projects representing an aggregate of 128.2 MW, all
         of the Sponsor contributed projects included in our initial portfolio have reached their
5         COD. We expect the remaining five projects to reach COD before the end of 2015. Our
         initial portfolio includes the Pending Acquisitions representing 921.7 MW that we
6         expect to close concurrently with the completion of the IPO and this offering or during
         the remainder of 2015. The Pending Acquisitions include three non-operational projects
7         representing an aggregate of 158.4 MW. Our acquisition of these projects is subject to
         their reaching COD, which we expect to occur before the end of 2015. However, we
8         cannot assure you that all of the projects in the Pending Acquisitions that are to be
         acquired upon reaching COD will achieve COD on the currently anticipated timelines or
9         at all, or that any of the Pending Acquisitions that are expected to close after the
         consummation of this [sic] the IPO will close on the currently anticipated timelines or at
10        all. Because the forecasted CAFD presented in this offering memorandum is based upon
         assumptions regarding the size of our portfolio and the timing of the consummation of
11        the Pending Acquisitions (which, in certain cases, depends upon the timing of projects
         under construction reaching COD), our actual CAFD for the forecast periods could be
12        smaller than the forecasted CAFD. See "Risk factors – Risks related to our business –
         There can be no assurance that the Pending Acquisitions will be consummated on the
13        timetable currently anticipated, and the closing of this offering is not conditioned on the
         consummation of these acquisitions" and "– Our forecasted and unaudited pro forma
14        financial information assumes the completion of all of the Pending Acquisitions." To
         reduce the effect on the Class A units of delays (if any) in the closing of the Pending
15        Acquisitions or the completion of the Contributed Construction Projects, our Sponsor
         has agreed to forego distributions on its Class B units under certain circumstances. See
16        "Certain relationships and related-party transactions – Amended and Restated Operating
         Agreement of Global LLC."

17        216.    The foregoing "risk disclosure" omitted material facts necessary to make the statements

18   made therein not misleading, including that at the time of the GLBL Bond Offering, SUNE lacked

19   sufficient liquidity to actually acquire the projects for GLBL's call rights list needed to support the

20   forecast growth, such as the LAP, Renova and Continuum acquisitions.  SUNE's cancellation of these

21   acquisitions, which included projects for GLBL's start-up project portfolio and call rights list, further

22   confirms that SUNE lacked the liquidity to fund the commencement of GLBL's operations.  The

23   foregoing statement also was materially false and misleading in that it indicated that the principal risks

24   to GLBL's start up were external delays (*i.e.*, in permitting, construction or government approvals),

25   whereas the real (and undisclosed) "risk" was that neither GLBL nor SUNE had lined up or had access

26   to the financing necessary to acquire those projects in the timeframes represented.

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

# FIFTH CAUSE OF ACTION

### For Violation of §15 of the 1933 Act
### in Connection with the GLBL Bond Offering
### Against SUNE, Chatila, Wuebbels and Truong

217.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

218.    This cause of action is brought pursuant to §15 of the 1933 Act against SUNE, Chatila, Wuebbels and Truong.

219.    SUNE controlled GLBL by virtue of its status as the sponsor of GLBL and its majority ownership of and voting power over GLBL, its power to appoint the majority of the members of GLBL's board, establish and enforce its operating policies and procedures, and the rights and responsibilities granted by the Management Services Agreement, Investment Agreement and other agreements with GLBL or its subsidiaries and affiliates, including those detailed in ¶¶10, 54, 147, 209 above.

220.    Chatila, Wuebbels and Truong controlled SUNE and GLBL by virtue of their senior positions with the companies and their power to set, influence and enforce the financial, operating and disclosure policies and procedures of the business as detailed in ¶¶12, 13, 15, 54, 147 above.

221.    Chatila, Wuebbels and Truong each had additional control over SUNE and GLBL as a result of their direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of SUNE and GLBL.

222.    The defendants named in this cause of action were each participants in the violations of §12(a)(2) of the 1933 Act as alleged above, based on the dissemination of the offering materials and/or otherwise having participated in the sales process which allowed the GLBL Bond Offering to be successfully completed.

# SIXTH CAUSE OF ACTION

### For Violation of the Maryland Securities Act, Md.
### Code §11-703, in Connection with the Purchase of GLBL Bonds Against
### GLBL, SUNE, Chatila, Wuebbels and the GLBL Bond Underwriters

223.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

224.   The GLBL Bond Offering Memorandum states that it was issued from Bethesda, Maryland.  Defendants named in this cause of action were therefore subject to, and required to comply with, the requirements of the Maryland Securities Act, Md. Code §11-101, *et. seq.*

225.   GLBL offered and sold the GLBL Bonds to Plaintiffs by means of the GLBL Bond Offering Materials which contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, as set forth in ¶¶203-216 above.

226.   SUNE directly or indirectly controlled GLBL at the time of the sale of GLBL Bonds to Plaintiffs.

227.   Chatila and Wuebbels were officers or directors of SUNE and GLBL at the time of the sale of GLBL Bonds to Plaintiffs.

228.   The GLBL Bond Underwriters materially aided the offer to sell and/or sale of GLBL Bonds to Plaintiffs by means of the GLBL Bond Offering Materials, which included untrue statements of material fact and/or omitted to state material facts required to be stated therein nearly identical to the untrue statements in the GLBL Bond Offering Materials, as alleged below and in ¶¶203-216 above.

229.   The defendants named herein knew about, or in the exercise of reasonable care could and should have known about, the misrepresentations and omissions in the GLBL Bond Offering Materials at the time of the sale of GLBL Bonds to Plaintiffs.

230.   None of the defendants named in this cause of action made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the GLBL Bond Offering Materials and the oral communications detailed herein were true and did not omit to state material facts necessary to be stated in order to make the statements made therein not false or misleading.  The defendants named herein, in the exercise of reasonable care, should have known of the misstatements and omissions as set forth above.

231.    Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the misrepresentations and omissions in the GLBL Bond Offering Materials at the time they purchased the GLBL Bonds.

232.    Plaintiffs suffered damages as a result of the misrepresentations and omissions in the GLBL Bond Offering Materials.  GLBL is civilly liable to Plaintiffs pursuant to Md. Code §11-703(a)(1)(ii).  SUNE, Chatila, Wuebbels and the GLBL Bond Underwriters are civilly liable to Plaintiffs pursuant to Md. Code §11-703(c)(1).  All defendants named in this cause of action are jointly and severally liable pursuant to Md. Code §11-703(c).

## SEVENTH CAUSE OF ACTION

### For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection with the Conversion of GLBL Class D Securities to GLBL Common Stock Against GLBL, SUNE, Chatila and Wuebbels

233.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

234.    This cause of action is brought pursuant to Md. Code §11-703 against GLBL, SUNE, Chatila and Wuebbels.

235.    This claim arises from the forced sale and conversion of Plaintiffs' GLBL Class D Securities into shares of restricted GLBL common stock at the time of, and in connection with, GLBL's IPO.  GLBL's IPO was completed by means of the IPO Offering Materials, which contained untrue statements of material fact and/or omitted to state material facts as required to be stated therein or were necessary to make the statements made therein not false or misleading.  The untrue statements of material fact and omissions in the IPO Offering Materials are nearly identical to those in the GLBL Bond Offering Materials, as alleged in ¶¶203-216 above.

236.    The GLBL Class D Registration Statement and the IPO Offering Materials claim on their face that they were signed in and issued from Bethesda, Maryland.  Defendants named in this cause of action were therefore subject to, and required to comply with, the requirements of the Maryland Securities Act, Md. Code §11-101, *et. seq.,* in connection with the offerings described therein.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

237.   On or about July 31, 2015, by means of the false and misleading GLBL Class D Registration Statement and IPO Offering Materials, GLBL purchased GLBL Class D Securities from Plaintiffs and sold GLBL common stock to Plaintiffs by converting their GLBL Class D Securities into shares of GLBL common stock.

238.   The GLBL Class D Securities converted by defendants to GLBL common stock were initially purchased on June 9, 2015 by Plaintiffs from GLBL. Plaintiffs' purchase was materially aided by Barclays, which acted on behalf of and as an agent for GLBL.

239.   The IPO Offering Materials contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made in those documents, in the light of the circumstances under which they were made, not misleading, as set forth above. But for the misrepresentations contained therein, GLBL would not have been able to complete the IPO, and therefore would not have been able to force the conversion of Omega's Class D Securities to restricted common stock.

240.   SUNE directly and indirectly controlled GLBL at the time of the conversion of GLBL Class D Securities to the restricted shares of GLBL common stock was sold to Plaintiffs.

241.   Chatila and Wuebbels were officers or directors of SUNE and GLBL at the time the Class D Securities were purchased from, and the restricted common stock was sold to, Plaintiffs.

242.   GLBL, SUNE, Chatila and Wuebbels knew about, or in the exercise of reasonable care could have known about, the misrepresentations and omissions in the GLBL Class D Registration Statement and the IPO Offering Materials at the time they were filed with the SEC and at the time the GLBL Class D Securities were purchased from, and the restricted GLBL common stock sold to Plaintiffs.

243.   Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the misrepresentations and omissions in the IPO Offering Materials at the time of the July 31, 2015 conversion.

244.   Plaintiffs have suffered damage as a result of the forced conversion of their Class D Securities by means of the false and misleading IPO Offering Materials.

245.    GLBL is civilly liable to Plaintiffs pursuant to Md. Code §11-703(a).  SUNE, Chatila and Wuebbels are civilly liable to Plaintiffs pursuant to Md. Code §11-703(c)(1).  All defendants named in this cause of action are jointly and severally liable pursuant to Md. Code §11-703(c).

**EIGHTH CAUSE OF ACTION**

**For Violation of the Maryland Securities Act, Md. Code §11-703, in Connection with the Purchase of GLBL Class D Securities Against GLBL, SUNE, Chatila, Wuebbels and the GLBL Placement Agents**

246.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

247.    This cause of action is brought pursuant to Md. Code §11-703 against GLBL, SUNE, Chatila, Wuebbels and the GLBL Placement Agents.

248.    The GLBL Class D Registration Statement claims on its face that it was signed in and issued from Bethesda, Maryland.  Defendants named in this cause of action were therefore subject to, and required to comply with, the requirements of the Maryland Securities Act, Md. Code §11-101, *et. seq.*

249.    On or about June 9, 2015, defendants named in this cause of action offered and sold GLBL Class D Securities to Plaintiffs by means of the GLBL Class D Registration Statement, which contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading, as set forth in ¶¶256-260 below.

250.    SUNE directly or indirectly controlled GLBL at the time of the sale of the GLBL Class D Securities to Plaintiffs by virtue of its status as the sponsor of GLBL and its majority ownership of and voting power over GLBL, its power to appoint the majority of the members of GLBL's board, establish and enforce its operating policies and procedures, and the rights and responsibilities granted by the Management Services Agreement, Investment Agreement and other agreements with GLBL or its subsidiaries and affiliates as detailed in ¶¶10, 54, 209 above.

251.    Chatila and Wuebbels were officers or directors of SUNE and GLBL at the time of the sale of GLBL Class D Securities to Plaintiffs.

- 61 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

252. The GLBL Placement Agents materially aided in the preparation of the GLBL Class D Registration Statement and the sale of the Class D Securities to Plaintiffs and other investors.

253. GLBL, SUNE, the GLBL Placement Agents, Chatila and Wuebbels knew about, or in the exercise of reasonable care could and should have known about, the misrepresentations and omissions in the GLBL Class D Registration Statement at the time it was filed with the SEC and at the time of the sale of GLBL Class D Securities to Plaintiffs.

254. Plaintiffs did not know, and could not in the exercise of reasonable diligence have known, of the misrepresentations and omissions in the GLBL Class D Registration Statement at the time they purchased the GLBL Class D Securities from GLBL.

255. Plaintiffs suffered damages as a result of the misrepresentations and omissions in the GLBL Class D Registration Statement. GLBL is civilly liable to Plaintiffs pursuant to Md. Code §11-703(a)(1)(ii). SUNE, Chatila, Wuebbels and the GLBL Placement Agents are civilly liable to Plaintiffs pursuant to Md. Code §11-703(c)(1). All defendants named in this cause of action are jointly and severally liable pursuant to Md. Code §11-703(c).

**Untrue Statements of Material Fact in and Other Material Facts Omitted from the GLBL Class D Registration Statement**

256. The GLBL Class D Registration Statement repeatedly emphasized the advantages of GLBL's relationship with SUNE, emphasizing at pages 13-14:

> *Relationship with SunEdison.* We believe our relationship with our Sponsor provides us with significant benefits, including the following:
>
> - *Strong asset development track record.* Over the last three calendar years, our Sponsor has constructed solar power generation assets with an aggregate capacity of 2.0 GW and, as of December 31, 2014, was constructing additional solar power generation assets expected to have an aggregate capacity of approximately 467 MW. Our Sponsor has been one of the top three developers and installers of solar energy facilities in the world in each of the past two years based on megawatts installed. Our Sponsor has developed over 1,300 solar projects and has completed all of the projects on which it has commenced construction, including over 100 projects in our initial target markets. In addition, our Sponsor had a 5.1 GW pipeline of development stage solar projects as of December 31, 2014, including 1.3 GW in our initial and future target markets. As of the same date, our Sponsor employed 2,700 people globally, of which over 1,900 were serving as developers and operators of renewable energy projects. *Our Sponsor's operating history demonstrates its organic project development capabilities in our initial target markets. We believe our Sponsor's relationships, knowledge and employees will facilitate our ability to*

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

*rapidly acquire operating projects from our Sponsor in our initial target markets.*

- *Yieldco experience.* Our Sponsor's subsidiary, TerraForm Power, which owns and operates clean power assets located in the U.S. and other select jurisdictions, completed its initial public offering in July 2014. With our Sponsor's support, TerraForm Power has raised approximately $3.9 billion in acquisition and permanent financing to pursue acquisitions of renewable energy projects totaling 1,703 MW as of May 1, 2015.

- *Proven acquisition expertise.* In 2014, our Sponsor completed 32 corporate and project acquisitions worldwide, which included operating projects with an aggregate nameplate capacity of 1.5 GW. In addition, our Sponsor, through TerraForm Power, completed the acquisition on January 29, 2015 of First Wind's 500 MW of operating wind generation assets and 21 MW of operating solar generation assets and 1.66 GW of wind and solar generation assets under development. *Our Sponsor has entered into seven separate acquisitions to acquire projects for our initial portfolio, expanding our geographic footprint and diversifying our renewable energy technologies. These acquisitions include LAP, which will provide our Sponsor with a hydro-electric development and operations and maintenance platform in Latin America, and Honiton, which will provide it with an operating and maintenance platform in China.* We believe our Sponsor's significant acquisition experience and expertise will enable us to expand our portfolio through additional acquisitions of operating projects from unaffiliated third parties in our initial target markets.

- *Project financing experience.* We believe our *Sponsor has demonstrated a successful track record of sourcing long-term capital to fund project acquisitions and the development and construction of projects located in our initial target markets. Over the twelve months ended January 31, 2015, our Sponsor has raised over $2.4 billion, including $2.1 billion to finance acquisitions. We expect that we will realize significant benefits from our Sponsor's financing and structuring expertise as well as its relationships with financial institutions and other providers of capital.*

- *Asset management expertise. We will have access to the significant resources of our Sponsor to support the high-growth strategy of our business.* As of December 31, 2014, our Sponsor had over 3.7 GW of projects under management across 20 countries. Approximately 19.0% of these projects are third-party power generation facilities, demonstrating our Sponsor's collaboration with multiple solar developers and owners. These projects utilize 29 different module types, and inverters from 16 different manufacturers. As of December 31, 2014, our Sponsor had approximately 700 employees servicing operations and management in our initial target markets. In addition, our Sponsor maintains three renewable energy operation centers to service assets under management. Our Sponsor's asset management experience helps ensure that our facilities will be monitored and maintained to maximize cash generation. We also benefit from First Wind's asset management expertise as the First Wind team has been integrated with our Sponsor. To date, First Wind has constructed or acquired wind power generation assets with an aggregate nameplate capacity of approximately 1.0 GW and, as of December 31, 2014, was constructing additional wind power generation assets expected to have an aggregate nameplate capacity of approximately 500 MW.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

257.    The GLBL Class D Registration Statement stated that at the time of the June 9, 2015 GLBL Class D offering GLBL's call rights projects to be provided to GLBL by SUNE would "represent an aggregate capacity of approximately 923.6 MW" and "forecast that our cash available for distribution during the twelve months ending June 30, 2016 and December 31, 2016 will be approximately $156.9 million and $164.8 million, respectively."

258.    The statements detailed in ¶¶256-257 above contained untrue statements of material fact or omitted to state other material facts necessary to make the statements made therein not misleading, including that:

(a)    SUNE lacked sufficient liquidity to support GLBL's stated acquisition strategy and CAFD growth forecasts while also meeting its other actual and anticipated financial commitments, including its financial obligations associated with the pending (but undisclosed) VSLR acquisition;

(b)    SUNE lacked sufficient cash to allow it to consummate the LAP acquisition;

(c)    SUNE had no reasonable basis to expect that it could develop sufficient additional liquidity sources given: (i) the amount of capital needed to carry out those activities, (ii) the existing state of the capital markets, (iii) the risks attendant with GLBL's emerging market operations, and (iv) the extent of SUNE's existing and other anticipated financing arrangements; and

(d)    as a result of (a)-(c) above, SUNE could not make the required $400 million payment on the LAP acquisition, and was faced with: (i) canceling plans to drop projects from the call rights list down to GLBL, including cancelling the Renova and Continuum acquisitions due to a lack of liquidity and the capital resources needed to complete them, and (ii) entering into acquisitions on unfavorable terms for the sole reason of providing SUNE with the cash needed to pay off the Margin Loan.

259.    The GLBL Class D Registration Statement also stated at page 139:

*Liquidity position*

We believe that following the completion of this offering we will have sufficient borrowings available under the Revolver, liquid assets and cash flows from operations to meet our financial commitments, debt service obligations, contingencies and anticipated required capital expenditures for at least the next twelve months.

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

*Sources of liquidity*

Following the completion of this offering, we expect our ongoing sources of liquidity to include cash on hand, cash generated from operations, borrowings under new and existing financing arrangements and the issuance of additional equity securities, as appropriate, given market conditions. We expect that these sources of funds will be adequate to provide for our short-term and long-term liquidity needs.

260.    The statements in ¶259 above contained untrue statements of material fact and omitted other material facts necessary to make the statements made therein not misleading at the time they were filed with the SEC and the GLBL Class D Purchase Agreement was consummated on June 9, 2015. The defendants named herein lacked a reasonable basis for these statements at the time they were made in light of the fact that SUNE and GLBL did not have sufficient liquidity to fund the acquisition and development of the projects needed for GLBL's start-up portfolio while still meeting their other financial commitments, including SUNE's commitments to develop and acquire projects for GLBL.

## NINTH CAUSE OF ACTION

### For Breach of Contract in Connection with the
### Purchase of GLBL Class D Securities Against GLBL

261.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

262.    This cause of action is brought for breach of the June 9, 2015 GLBL Class D Purchase Agreement entered into by Plaintiffs and GLBL, as previously alleged.

263.    The GLBL Class D Purchase Agreement provides that the contract is to be governed by and construed according to the law of the State of Delaware.

264.    The parties to the GLBL Class D Purchase Agreement intended to be bound by the terms of the agreement, which are sufficiently definite to be enforced.

265.    Plaintiffs purchased their GLBL Class D Securities from GLBL, paying valuable consideration measuring in the millions of dollars for the rights and benefits they received under the GLBL Class D Purchase Agreement. Plaintiffs' purchase was materially aided by Barclays. Barclays acted on behalf of and as agents for GLBL.

266.    Section 4 of the GLBL Class D Purchase Agreement contained representations and warranties made by GLBL "[a]s a material inducement to the Purchasers to enter into this Agreement and purchase the Class D Units hereunder."

- 65 -

267.    Section 4F of the GLBL Class D Purchase Agreement included the following representation and warranty by GLBL:

> As of the date of its filing with the SEC, the [May 7, 2015] Draft Registration Statement did not contain any misstatement of material fact or omit to state a material fact necessary to prevent the statements made therein from being misleading in any material respect, other than omitting information regarding valuation and financial projections.

268.    The GLBL Class D Registration Statement contained false statements of material fact and omitted to state facts necessary to prevent the statements made therein from being materially misleading, as described in ¶¶256-259.  GLBL therefore breached §4F of the Class D Purchase Agreement.

269.    Plaintiffs suffered damages as a result of GLBL's breach of §4F of the Class D Purchase Agreement.

270.    Section 4I of the GLBL Class D Purchase Agreement included a representation and warranty that "[s]ince December 31, 2014, (i) the Company and its Subsidiaries have, in all material respects, conducted their business in the ordinary course of business consistent with past practice and (ii) there has not been any Material Adverse Effect and no circumstances have arisen, which, individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect." Section 6 of the GLBL Class D Purchase Agreement defines Material Adverse Effect as "a material and adverse effect or development upon the business, results of operations, assets, liabilities or financial condition of the Company and its Subsidiaries, taken as a whole."

271.    Section 4I was materially false and misleading.  The true facts were that SUNE had commenced negotiations to acquire VSLR prior to the filing of the GLBL Class D Registration Statement and was intent on acquiring VSLR *before* defendants named herein sold the GLBL Class D Securities to Plaintiffs on or about June 9, 2015, and had already entered an exclusive negotiating period to finalize the terms of the transaction.  VSLR's residential solar business represented a significant change from SUNE's, GLBL's and TERP's historical business, and would require more than $1 billion of additional financing to complete, as alleged above.  Thus, the planned VSLR acquisition represented a substantial and material departure in the conduct of the companies' business inconsistent with past practice.  Both individually and in the aggregate, the intended acquisition of VSLR was a

1    circumstance that was reasonably expected to have a Material Adverse Effect on GLBL, given the

2    additional financing required to consummate the VSLR acquisition and the lack of liquidity sufficient to

3    enable SUNE to meet its financial commitments to acquire, develop and construct projects to drop

4    down to GLBL following its IPO.

5          272.    GLBL breached §4I of the GLBL Class D Purchase Agreement.

6          273.    Plaintiffs suffered damages as a result of GLBL's breach of §4I of the Class D Purchase

7    Agreement.

8                              **TENTH CAUSE OF ACTION**

9                      **For Negligent Misrepresentation in Connection with the**
                       **Purchase of GLBL Class D Securities Against SUNE,**
10                     **GLBL, Chatila, Wuebbels and the GLBL Placement Agents**

11         274.    Plaintiffs incorporate all prior allegations of the complaint herein by reference.

12         275.    This claim is brought against SUNE, GLBL, Chatila, Wuebbels and the GLBL

13   Placement Agents.

14         276.    The GLBL Class D Registration Statement contained untrue statements of material fact

15   or omitted to state other material facts necessary to make the statements made therein not misleading, as

16   alleged in ¶¶256-259 above.

17         277.    SUNE, GLBL, Chatila, Wuebbels and the GLBL Placement Agents had no reasonable

18   grounds for believing that the representations alleged in ¶¶256-257, 259 above did not contain untrue

19   statements of material fact or omitted to state other material facts necessary to make the statements

20   made therein not misleading.

21         278.    SUNE, GLBL, Chatila, Wuebbels and the GLBL Placement Agents intended that

22   Plaintiffs rely on the representations alleged in ¶¶256-257, 259 above in making a decision to purchase

23   the GLBL Class D Securities.

24         279.    Plaintiffs reasonably and justifiably relied on the representations alleged in ¶¶256-257,

25   259, above in entering into the GLBL Class D Purchase Agreement and in purchasing the GLBL Class

26   D Securities pursuant thereto.

27

28

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW

1    280.    Plaintiffs' reliance on the representations made by SUNE, GLBL, Chatila, Wuebbels and

2  the GLBL Placement Agents was a substantial factor in causing Plaintiffs' harm.

3    281.    Plaintiffs were harmed as a result of their purchases of GLBL Class D Securities.

## PRAYER FOR RELIEF

4

5   WHEREFORE, Plaintiffs pray for relief and judgment as follows:

6    A.    Awarding Plaintiffs damages, together with pre- and post-judgment interest as provided

7  by contract or law;

8    B.    Awarding rescission or a rescissory measure of damages;

9    C.    Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

10    D.    Awarding such other relief, including equitable or injunctive relief, as is just and proper

11  under the circumstances.

## JURY DEMAND

12

13   Plaintiffs demand a trial by jury on all claims so triable.

14  DATED:  March 29, 2016          ROBBINS GELLER RUDMAN
                                      & DOWD LLP
15                                  DARREN J. ROBBINS
                                    JAMES I. JACONETTE
16                                  JENNIFER N. CARINGAL

17

18                                  DARREN J. ROBBINS

19                                  655 West Broadway, Suite 1900
20                                  San Diego, CA  92101
                                    Telephone:  619/231-1058
21                                  619/231-7423 (fax)

22                                  ROBBINS GELLER RUDMAN
                                      & DOWD LLP
23                                  DENNIS J. HERMAN
                                    DAVID W. HALL
24                                  Post Montgomery Center
                                    One Montgomery Street, Suite 1800
25                                  San Francisco, CA  94104
                                    Telephone:  415/288-4545
26                                  415/288-4534 (fax)

                                    Attorneys for Plaintiffs
27

28  I:\Admin\CptDraft\Securities\CPT SunEdison_Glenview.docx

- 68 -

COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 AND STATE LAW